A02A0641. FIDELITY NATIONAL TITLE INSURANCE COMPANY v. MATRIX FINANCIAL SERVICES CORPORATION.
(567 SE2d 96)

RUFFIN, Judge.

Matrix Financial Services Corporation ("Matrix") sued Fidelity National Title Insurance Company ("Fidelity") in Fulton County for breach of a title insurance contract and bad faith refusal to pay an insurance claim. Matrix moved for summary judgment, which the trial court granted. Fidelity now appeals, and for reasons that follow, we affirm.

To prevail on a motion for summary judgment, "the movant must show that there is no genuine issue of material fact and that the facts, viewed in the light most favorable to the nonmovant, warrant judgment as a matter of law."[1] Viewed favorably to Fidelity, the

---

[1] *GFA Business Solutions v. Greenway Ins. Agency*, 243 Ga. App. 35 (531 SE2d 134) (2000).

record shows that, in 1991, Harold and Deborah Haygood sold land located in Monroe County ("the property") to Hamilton Jones for $115,000. At the closing, Jones delivered to the Haygoods a deed to secure debt on the property for $105,000. Jones also gave Mildred Mock, the Haygoods' real estate agent, a security deed for $3,240, which represented part of her real estate commission. Both security deeds were recorded in the Monroe County real estate records.

Unable to collect the indebtedness from Jones, the Haygoods prepared to foreclose on the property in 1992. Before the foreclosure, however, Jones gave them a deed in lieu of foreclosure dated September 28, 1992. The Haygoods did not file the deed in the county records, and Jones remained on the property. Matrix and Fidelity did not learn about the deed in lieu of foreclosure until the discovery phase of this litigation.

In 1997, Jones sought to "refinance" the property for $105,000 and submitted a uniform residential loan application to Premier Financial Services ("Premier"). Despite giving the Haygoods a deed in lieu of foreclosure in 1992, Jones represented that he owned the property in fee simple. Premier processed the application and "put everything in proper order to go to Matrix," the lender. As described by a Matrix representative, Premier's role was to "solicit, process and originate [the] loan application[ ] for assignment to Matrix for underwriting, closing and funding."

Matrix approved Jones' loan application and proceeded with the loan closing. Before the closing, Gerald Fudge, Matrix's closing attorney, obtained a property title search, dated July 2, 1997, which revealed the 1991 Haygood and Mock security deeds. Fudge contacted Premier about the outstanding liens, and he subsequently received orders for cancellation relating to both security deeds. The Haygoods' cancellation order, which stated that the 1991 indebtedness had "been paid in full," was dated July 7, 1997, and recorded in the county records on July 8, 1997. The Mock cancellation, dated July 9, 1997, and recorded the following day, similarly indicated that Jones' 1991 debt to Mock had been fully satisfied.

Matrix closed the Jones loan on July 16, 1997. To secure the $105,000 debt, Jones gave Matrix a security deed to the property. Fudge recorded Matrix's security deed in the Monroe County records on July 28, 1997.

As part of the loan transaction, Matrix purchased a title insurance policy from Fidelity through Fudge, who was acting as Fidelity's agent. The title policy named "Matrix Financial Services Corporation, its successors and/or assigns" as the "insured." By its terms, the policy protected the insured against loss or damage by reason of, among other things, defects in or liens or encumbrances on the title, unmarketability of title, or the priority of any lien or encumbrance

over the lien of the insured mortgage. The policy required Fidelity to defend the insured against third-party claims asserting superior title in the property. Fidelity also had the right, "at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage to the insured."

The policy required the insured to give Fidelity "all reasonable aid" in such actions. It also excluded from coverage "[d]efects, liens, encumbrances, adverse claims, or other matters . . . created, suffered, assumed or agreed to by the insured claimant." In addition, Fidelity could not be held liable for loss or damage "voluntarily assumed by the insured in settling any claim or suit without [Fidelity's] prior written consent."

After the closing, Matrix assigned its interest in the property and the loan to Residential Funding Corporation ("Residential Funding"). Jones ultimately defaulted on the loan, and Residential Funding commenced foreclosure proceedings. During those proceedings, Residential Funding discovered that, on July 7, 1997, Jones gave the Haygoods a new security deed in the property to secure a $170,000 debt. On July 9, 1997, he also gave Mock a security deed for $5,061.50. The Haygoods recorded their security deed on July 8, 1997, and Mock recorded her deed on July 10, 1997, well before Matrix recorded its security deed on July 28, 1997. Residential Funding informed Fidelity about the Haygood and Mock security deeds. Given the apparent problems with title priority, Residential Funding also requested that Matrix repurchase the Jones loan, which Matrix agreed to do.

On June 9, 1999, the Haygoods declared their loan to Jones in default and threatened foreclosure under their July 7, 1997 security deed. Later that month, Matrix demanded payment from Fidelity under the title insurance policy, but Fidelity did not satisfy the claim. In July 1999, the Haygoods commenced foreclosure proceedings, claiming superior title. Although the record is not clear, it appears that the Haygood foreclosure sale took place on September 7, 1999.

Matrix sued Fidelity under the title insurance policy on September 22, 1999, asserting that the 1997 Haygood and Mock security deeds are superior to Matrix's deed, rendering the property unmarketable. According to Matrix, Fidelity breached its title insurance obligations by not providing Matrix with clear title to the property or paying Matrix the policy amounts. Matrix further claimed that Fidelity refused to pay the insurance claim in bad faith. Construing the title insurance policy, the trial court granted Matrix summary judgment on both claims. We find no error.

1. *Breach of Contract.* Fidelity argues that the trial court improperly granted Matrix summary judgment on the breach of contract claim because (a) Matrix enjoys first priority title in the property and thus has not suffered a loss, and (b) to the extent any loss occurred, Matrix's own actions caused that loss.

(a) We disagree with Fidelity's assertion that Matrix has not suffered a loss under the title policy. At this point, two security deeds recorded prior to Matrix's deed are on file with the Monroe County clerk's office. A third party has asserted and, according to the recorded filings, has priority over Matrix's interest, a condition insured against under the policy.[2]

Furthermore, the policy defines "unmarketability" as "an alleged or apparent matter affecting the title to the land . . . which would entitle a purchaser of the estate or interest . . . or the insured mortgage to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of a marketable title." Under Georgia law, a marketable title is one that is both unencumbered and "free of any such cloud as would prevent it from being sold to a reasonable purchaser or mortgaged to a person of reasonable prudence."[3] In this case, Matrix's interest in the property is encumbered by the senior Haygood and Mock security deeds, raising marketability issues.

Notwithstanding the 1997 Haygood and Mock security deeds, Fidelity contends that Matrix has a first priority interest in the property. According to Fidelity, because Jones gave the Haygoods a deed in lieu of foreclosure in 1992, the 1997 security deeds conveyed no interest in the property and are, therefore, invalid. Fidelity also argues that Matrix has priority over the unrecorded deed in lieu of foreclosure.

Fidelity may be correct that, in an action to quiet title, Matrix's interest would be deemed superior to the Haygood and Mock interests. A quiet title action, however, must be brought in the county where the land is situated — here, Monroe County.[4] The record contains no evidence that any action to adjudicate the property's title has been filed in Monroe County or, for that matter, in any other county. The evidence shows instead that the Haygoods and Mock recorded security deeds before Matrix filed its deed, and no court has

---

[2] See OCGA §§ 44-2-2 (b); 44-14-63 (a); *Church of the Nativity v. Whitener*, 249 Ga. App. 45, 47 (2) (547 SE2d 587) (2001) ("In a contest between deeds upon a valuable consideration, from the same grantor, conveying the same property, such deeds, as against each other, where taken without notice, will take priority only from and after the date of lawful record or filing for record.") (punctuation and footnote omitted).

[3] *Hill v. McGarity*, 179 Ga. App. 788, 789 (1) (347 SE2d 679) (1986).

[4] See OCGA § 23-3-62 (a); *Smith v. Ga. Kaolin Co.*, 264 Ga. 755-756 (1) (449 SE2d 85) (1994).

declared those security deeds invalid. Indeed, the Haygoods instituted foreclosure proceedings — and apparently foreclosed — in 1999. Fidelity's claim that Matrix suffered no loss under the policy, therefore, lacks merit.

(b) Fidelity also contends that, even if Matrix suffered a loss under the policy, Matrix — not Fidelity — is responsible for that loss. In Fidelity's view, Matrix's claim is excluded by the policy, which excepts from coverage defects, liens, or encumbrances "created, suffered, assumed, or agreed to by the insured claimant." As with any insurance policy, we construe the policy exclusions "most strongly against the insurer and in favor of providing the indemnity sought."[5] The policy's terms are also "construed as reasonably understood by an insured."[6] Applying these principles, we find no merit in Fidelity's causation arguments.

(i) Fidelity first asserts that Matrix caused its damages — and failed to mitigate them — by refusing to bring suit to establish its superior interest in the property. Nothing in the policy's terms, however, required Matrix to prosecute a quiet title action or to otherwise commence litigation challenging the Haygoods' adverse claim. Instead, the policy gave *Fidelity* the right to establish Matrix's superior interest or cure the title defect through litigation or other action.[7] Matrix was merely obligated to *aid* Fidelity in this effort. And this "aid" provision cannot reasonably be understood to require the insured to institute legal action, particularly when the policy expressly gives Fidelity the right to bring — at its own expense — such an action.

Given the clear policy terms, and construing the policy exclusions against Fidelity, we refuse to find that Matrix created, suffered, assumed, or agreed to the adverse title claims by not instituting a quiet title action or otherwise challenging those claims in court. Furthermore, since the policy did not require Matrix to commence litigation, we cannot find that Matrix failed to mitigate its damages by declining to do so.[8]

(ii) In addition, Fidelity claims that Matrix "locked in" its loss by repurchasing the Jones loan from Residential Funding. Fidelity apparently contends that, through the repurchase, Matrix agreed to

---

[5] *Southern Guaranty Ins. Co. &c. v. Saxon*, 190 Ga. App. 652 (379 SE2d 577) (1989).

[6] *St. Paul Fire &c. Ins. Co. v. Snitzer*, 183 Ga. App. 395, 397 (1) (358 SE2d 925) (1987).

[7] To this point, Fidelity has chosen not to exercise this right.

[8] See *J. C. Penney &c. Ins. Co. v. Woodard*, 190 Ga. App. 727, 729 (1) (380 SE2d 282) (1989) ("Since the [insured claimants] were not required by law or contract to reduce [the insurer's] liability by obtaining, maintaining, or availing themselves of other insurance, we conclude neither were they required by any legal or equitable principle of duty to mitigate [the insurer's] 'absolute promise to pay' in this case.") (emphasis omitted).

the adverse claims or voluntarily assumed the loss by settling a claim without Fidelity's consent. Again, we disagree.

Fidelity knew that the Jones loan might be transferred or assigned between lenders. In fact, its policy specifically described the "insured" as Matrix and "its successors and/or assigns." It further defined "insured" as "the owner of the indebtedness secured by the insured mortgage and each successor in ownership of the indebtedness."

Moreover, Fidelity has pointed to no policy term restricting the insured's right to assign or transfer the indebtedness. And the policy did not limit or exclude the transferee's coverage rights merely because the transferee accepted a transfer with knowledge of a title defect. Instead, it reserved to Fidelity "all rights and defense as to any successor that [Fidelity] would have had against any predecessor insured, *unless the successor acquired the indebtedness as a purchaser for value without knowledge of the asserted defect, lien, encumbrance, adverse claim or other matter insured against.*"[9]

The policy thus anticipated that a successor insured, such as Matrix in this situation, might purchase the indebtedness with knowledge of an adverse claim. Although Fidelity reserved its rights and defenses against a knowledgeable successor, the policy did not state that the successor accepted the adverse claim or settled a claim under the policy simply by acquiring the indebtedness. Despite Matrix's knowledge of the adverse claims, therefore, its decision to purchase the Jones loan from Residential Funding did not undermine coverage.

(iii) Fidelity also argues that Matrix should never have closed the Jones loan and that, by doing so, it created its own loss. The parties agree that Jones made various misrepresentations in the loan transaction. According to Fidelity, if Matrix had properly investigated Jones' representations and performed an adequate property title search, Matrix would not have closed the loan. It thus contends that Matrix negligently created its own title problems and cannot legally or equitably seek coverage under the policy.

Once again, we find no merit in Fidelity's argument. Fidelity has pointed to no policy provision excluding from coverage a mortgage transaction that, in its view, should not have closed. Regardless of the circumstances underlying the loan transaction, Fidelity agreed to insure the priority of Matrix's interest in the property. By issuing the title insurance, Fidelity gave its opinion " 'concerning the validity of title, backed by an agreement to make that opinion good if it should

---

[9] (Emphasis supplied.)

prove to be mistaken and a loss should result in consequence.' "[10] It cannot avoid its policy obligations simply by second-guessing Matrix's decision to close the loan. Regardless of whether Jones was an appropriate loan risk, Fidelity insured the title.

Furthermore, Georgia law permitted Fidelity to write its title policy "only upon evidence or opinion of title *obtained and preserved by the insurer*."[11] Fidelity — not Matrix — was responsible for obtaining the evidence to support its title opinion.[12] Matrix's failure to discover the prior-filed security deeds, therefore, is irrelevant to Fidelity's liability.

(iv) Finally, Fidelity briefly argues that Matrix failed to cooperate with Fidelity under the policy and mitigate its damages by refusing to demand that Premier purchase the Jones loan. According to Fidelity, because Premier was negligent in preparing and investigating Jones' loan application, Matrix could have forced Premier — presumably through litigation — to indemnify it or purchase the Jones loan. Again, however, nothing in the title insurance policy required Matrix to pursue Premier for negligent loan preparation. As discussed above, the policy only obligated Matrix to *aid* Fidelity in the defense and prosecution of actions. Matrix's failure to seek a remedy from Premier, therefore, did not subvert its title insurance coverage.[13]

2. *Bad Faith Failure to Pay.* In its complaint, Matrix alleged that Fidelity violated OCGA § 33-4-6 by refusing in bad faith to pay the title insurance claim. That Code section "subjects an insurer to penalties and attorney fees if it refuses to pay a covered loss in bad faith."[14] Bad faith penalties may not be assessed, however, " 'if [the] insurer has a reasonable and probable cause for refusing to pay a claim.' "[15] Fidelity argues that, because it had reasonable defenses to Matrix's claim, the trial court erred in granting Matrix summary judgment on the bad faith allegations.

The trier of fact generally resolves questions of bad faith.[16] In this case, however, we agree with the trial court that summary judgment was proper. Matrix obtained a title insurance policy to guard against a defect in the title. The policy required Fidelity to pay — or otherwise cure the title problem — in the event of such defect. Here,

---

[10] *Green v. Sams*, 209 Ga. App. 491, 497 (1) (433 SE2d 678) (1993).

[11] (Emphasis supplied.) OCGA § 33-7-8.

[12] See id.

[13] See *J. C. Penney*, supra.

[14] *Shaffer v. State Farm &c. Ins. Co.*, 246 Ga. App. 244, 245 (540 SE2d 227) (2000).

[15] Id.

[16] See *First Financial Ins. Co. v. American Sandblasting Co.*, 223 Ga. App. 232, 233 (2) (477 SE2d 390) (1996).

a defect clearly existed, triggering Fidelity's obligations under the policy.

Furthermore, as found in Division 1, each of Fidelity's defenses lacks merit as a matter of law. Even if, as Fidelity claims, Matrix negligently closed the Jones loan, Fidelity was not relieved of its obligations under the title insurance policy. Fidelity's mitigation of damages arguments also fail, given the policy terms. We recognize that questions remain regarding title priority. Yet, two prior-recorded security deeds currently encumber Matrix's interest. And although the title policy gave Fidelity the right to litigate the title dispute, it instead insisted that Matrix bring such an action. Under the policy terms, Fidelity's effort to shift this responsibility to Matrix was unreasonable.

Fidelity presented no valid grounds to contest Matrix's insurance claim. Accordingly, the trial court did not err in awarding Matrix summary judgment on its bad faith allegations.

3. Our decision in Divisions 1 and 2 renders Fidelity's remaining enumerations of error moot.

*Judgment affirmed. Pope, P. J., and Barnes, J., concur.*

DECIDED JUNE 18, 2002.

*Shapiro, Fussell, Wedge, Smotherman & Martin, George M. Kent, Jr.*, for appellant.

*McCalla, Raymer, Padrick, Cobb, Nichols & Clark, Scott H. Michalove, Peter L. Lublin*, for appellee.