[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-10495

_____

D.C. Docket No. 1:10-cv-00068-JRH-WLB

CYNERGY, LLC,
as successor in interest to Farmers State Bank,

                                               Plaintiff - Appellant,

versus

FIRST AMERICAN TITLE INSURANCE COMPANY,

                                               Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(January 28, 2013)

Before MARCUS and PRYOR, Circuit Judges, and FRIEDMAN,[*] District Judge.

FRIEDMAN, District Judge:

    In this appeal, we are asked to review the district court's interpretation of an

exclusion in a title insurance policy issued by the appellee, First American Title

_____

    [*] Honorable Paul L. Friedman, United States District Judge for the District of Columbia,
sitting by designation.

Insurance Company, to a Georgia bank, Farmers State Bank, and the district court's decision that First American was entitled to summary judgment based on that exclusion. We affirm the district court in all respects.

## I. BACKGROUND

### A. Factual Background

This dispute arises from a land development project that failed to go according to plan. The essential facts are as follows. A group of real estate investors formed a company — the Retreat at Lake Thurmond, LLC — to purchase an undeveloped parcel of land in Lincoln County, Georgia, and turn it into a residential subdivision. The Retreat took out a short-term purchase loan from a local institution, Farmers State Bank, to finance only the acquisition of the land; the costs of development were to be funded later from a separate source. The Bank, to protect itself from risks associated with the loan it was extending, also obtained personal guarantees from two of the Retreat's principal investors, Tommy Lee and Dean Antonakos, and secured debt on real property owned by individual Retreat investors as additional collateral for the loan. It also took out a title insurance policy with First American Title Insurance Company. Such policies insure "owners of real property or others having an interest in such real property . . . against loss by encumbrance, defective titles, invalidity, adverse claim to title,

2

or unmarketability of title by reason of encumbrance or defects not excepted in the insurance contract." Ga. Code Ann. § 33-7-8.

Using the funds it borrowed from the Bank, the Retreat purchased the parcel of land in September 2006. Although it promptly commenced preliminary construction operations, clearing and grading the property, its development plans did not proceed as anticipated. Among the issues with which the Retreat contended was that the property did not abut a public road and lacked dedicated access to any public road. The previous owner, Emily Hester, had accessed the property through a neighboring lot with the permission of its owners. Permissive access was also available via a gravel road situated on adjacent land owned by the United States Army Corps of Engineers, but the property had no legally enforceable right of access. Although the Retreat was aware of this condition before it purchased the property and had intended to obtain an easement across the Army Corps of Engineers land, it abandoned this plan after deeming it too expensive.

The title insurance policy that First American issued to the Bank covered, among other things, loss or damage incurred due to a "lack of a right of access to and from the land." A year after the Retreat purchased the property, it sent a letter to First American purporting to file a claim under this provision of the insurance

3

policy. First American denied the claim because the Bank, not the Retreat, was the insured party.

The Retreat attempted to solve its dedicated access problem by purchasing an adjoining tract of land in 2008 that contained a road leading to the highway. Progress continued to lag, however, due to the Retreat's inability to secure funding for development. Meanwhile, interest on the Retreat's purchase loan from the Bank continued to accrue, while the loan's maturity date approached. In an attempt to reach a mutually beneficial resolution to the Retreat's difficulty in paying back the purchase loan to Farmers State Bank, the Bank and the Retreat began to negotiate about a possible extension of the loan with modified terms. In October 2008, a principal investor behind the Retreat, Dean Antonakos, sent a letter to the Bank acknowledging that while the Retreat originally planned to fund the development of the property through other sources, "due to the financial climate of the over all economy, especially in the banking sector, those original development sources have dried up." Antonakos suggested, among other options, that the Retreat could complete preliminary improvements of the property in tandem with work on the newly purchased adjacent property, with the aim of selling the two together as a single subdivision that could be developed later — an endeavor that would require additional funding from the Bank.

4

Antonakos wrote to the Bank again the next month, acknowledging an "impasse" in their discussions and suggesting some alternative courses of action. In this letter, Antonakos drew the Bank's attention to its title insurance policy with First American and encouraged the Bank to file a claim under the provision that offered coverage for losses incurred due to the lack of a right of access to and from the land.

In March 2009, the Bank's executive vice president, J. Bruce Turner, wrote to Antonakos, declining Antonakos' invitation to make a claim against First American for the insurance proceeds and proposing two options for extending and modifying the loan. In this letter, Turner also stated: "When we originally made this loan, we knew that there was no designated access to the property, but it was in your plans to create one" from the nearby highway.

No agreement was reached with respect to extending the loan. Once the loan went into default, the Bank indicated that it might seek to recover on the personal guarantees that were made at the time of the loan by Antonakos and another Retreat investor, Tommy Lee. To extricate the Retreat from its debt to the Bank, Antonakos, Lee, and others formed a new company — Cynergy, LLC, the appellant here — to raise additional funds from third parties and purchase the Retreat's promissory note from the Bank. This newly formed company acquired

5

the note at full price in May 2009, essentially purchasing the Bank's loan. Through this transaction, Cynergy became the successor in interest to the Bank under the insurance policy.[1]

Four days after acquiring the Retreat note, Cynergy submitted to First American an insurance claim premised on the Retreat property's lack of dedicated access. First American retained counsel who conducted an investigation into the matter, after the completion of which First American denied the claim. It based this denial on one of the exclusions in the policy, a provision excluding coverage for matters "assumed or agreed to" by the insured. First American explained in its denial letter that, according to the results of its investigation, the Bank extended the loan with full awareness that the land had no dedicated right of access. Therefore, in First American's view, the property's lack of dedicated access was a condition "assumed or agreed to" by the Bank.

After First American refused a subsequent demand for payment, Cynergy filed suit in state court, seeking damages for breach of contract along with bad-faith penalties. First American removed the case to federal court, and the parties

---

[1] We pause to note that Antonakos and Lee therefore appear in this narrative in two different roles. Acting on behalf of the Retreat, they initially secured the loan from the Bank and negotiated the purchase of the land. After that loan went into default, acting on behalf of Cynergy they acquired the loan, stepping into the Bank's shoes.

filed cross-motions for summary judgment on the issue of First American's

liability under the policy.

## B. The District Court's Decision

The district court granted summary judgment to First American. The court

first agreed with Cynergy's interpretation of the term "right of access" in the title

insurance policy, concluding that the policy covers losses resulting from the lack

of a <u>dedicated, legally enforceable</u> right of access to the property. It rejected First

American's argument that the scope of the policy is limited to situations in which

the claimant also lacks permissive access. Applying the established principle

under Georgia law that ambiguity in insurance contracts should be resolved in

favor of coverage, the court construed the phrase "lack of a right of access to and

from the land" to mean the lack of legally enforceable access rights, even where,

as here, the property owner has never lacked permissive access to the land. The

court further found that the Retreat property did not have a legally enforceable

right of access. The court therefore determined that Cynergy's claim fell within

the scope of the insurance policy.

The court then turned to the next question: whether coverage nevertheless

was defeated by the policy exclusion negating coverage for losses arising from

"defects, liens, encumbrances, adverse claims or other matters" that were "created, suffered, assumed or agreed to by the insured claimant."

Drawing on common definitions of the word "assume," along with the meaning that the word has been given in title insurance policies and in the analogous tort context of assumption of risk, the court concluded that the word, as used in the policy, "means that the Bank must have had actual, subjective knowledge of the access issue and appreciated its effect." No party before us disagrees with that definition.

Applying this standard, the district court found that "the evidence and undisputed facts show that the lack of dedicated access was indeed an 'assumed' condition." In reaching this conclusion, the court relied primarily on the sworn affidavit of George C. Leverett III, the Bank's former president and the officer who personally handled the Retreat loan. In his affidavit, Leverett states that at the time of the loan application, "I was aware that the tract appeared to be landlocked, but I was told by Tommy Lee of Retreat LLC that he was pursuing and expected to obtain an access easement to Highway 378 for their future development plans." The affidavit further explains that because the Bank was not financing the planned development of the property, but was only issuing a short-term loan for the purchase of the land, "obtaining adequate collateral on the loan

8

was more important to [the Bank] than the issue of how the property would be accessed for purposes of Retreat LLC's planned development."

The district court determined that Leverett's affidavit, along with a number of corroborating circumstances lending credence to his statements, demonstrated both the Bank's knowledge of the lack of access and its appreciation of the significance of that condition. It was precisely because the Bank knew that the property lacked dedicated access, Leverett attests, that the Bank "required additional collateral" for the loan beyond the security deed to the property itself, including personal guarantees from Antonakos and Lee as well as security deeds to properties owned by individual Retreat members. The court further observed that the Bank itself never filed an insurance claim with First American based on the property's lack of access, even when pressed to do so by Antonakos — an additional circumstance indicating that the Bank knowingly acquiesced to the lack of dedicated access when it issued the loan. Based on the evidence, the court found, the "only reasonable inference available" was that the Bank "assumed" the Retreat property's lack of dedicated access when it financed the purchase of the property and that "Leverett understood the implications of the issue and accounted for it by securing ample collateral." And Cynergy, the district court stated, presented "no evidence" to rebut this testimony and evidence.

9

Instead, Cynergy presented two legal arguments.  First, Cynergy took issue with the interpretation of the insurance policy and its exclusions summarized above.  In Cynergy's view, reading the policy to exclude conditions, like a lack of dedicated access, that were "assumed" by the insured party would "eviscerate" coverage under the policy.  The district court quicky dispensed with this argument, which Cynergy revives before this Court and which is discussed below.  Second, Cynergy contended that George Leverett's affidavit was inadmissible as hearsay and barred from consideration by Rule 56(c)(4) of the Federal Rules of Civil Procedure.  The district court, acknowledging the dispositive effect of the affidavit on its ruling, engaged in a lengthy analysis of this point, finding the affidavit to be admissible under Rule 807 of the Federal Rules of Evidence and, contrary to Cynergy's arguments, in no way barred from consideration by Rule 56(c)(4).  Having rejected these legal arguments, and finding no genuine issues of material fact in dispute, the court granted summary judgment to First American.

## II.  JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.  This Court reviews a district court's grant of summary judgment de novo.  Kernel Records Oy v. Mosley, 694 F.3d 1294, 1300 (11th Cir. 2012).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any

10

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine factual dispute exists only if a reasonable factfinder "could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505 (1986). "Once the movant adequately supports its motion, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial." Dietz v. Smithkline Beecham Corp., 598 F.3d 812, 815 (11th Cir. 2010).

The district court's evidentiary rulings are reviewed for abuse of discretion and will be reversed only "if an erroneous ruling resulted in 'substantial prejudice.'" Conroy v. Abraham Chevrolet-Tampa, Inc., 375 F.3d 1228, 1232 (11th Cir. 2004) (quoting Piamba Cortes v. Am. Airlines, Inc., 177 F.3d 1272, 1305 (11th Cir. 1999)). This Court will affirm such rulings "unless the district court has made a 'clear error of judgment' or has applied an 'incorrect legal standard.'" Id. (quoting Piamba Cortes, 177 F.3d at 1306).

## III.  DISCUSSION

### A.  Interpretation of the Insurance Policy

Cynergy maintains that the district court's interpretation of the policy exclusion under which it granted summary judgment to First American is unduly broad and inconsistent with Georgia law. As Cynergy reads it, the insurance

11

policy guarantees coverage without exception for losses incurred due to a property's lack of dedicated access. Any knowledge that the Bank may have had about the Retreat property's lack of access is therefore irrelevant in Cynergy's view. We find no merit to Cynergy's arguments.

The title insurance policy covers, among other matters, "loss or damage . . . sustained or incurred . . . by reason of . . . lack of a right of access to and from the land." Among the losses and damages excluded from coverage, however, are those arising from "defects, liens, encumbrances, adverse claims or <u>other matters</u> . . . created, suffered, <u>assumed</u> or agreed to by the insured claimant" (emphasis added). As discussed above, the district court construed these provisions as excluding coverage if the insured "assumed" the lack of a right of access, which the court interpreted to mean that the insured was aware of the lack of access when the policy was issued and appreciated its effect. The district court's assumption of risk analogy, quoting <u>Vaughn v. Pleasent</u>, 471 S.E.2d 866, 868 (Ga. 1996) (emphasis in original), is to the same effect: "In its simplest and primary sense, assumption of the risk means that the plaintiff, in advance, has given his consent to relieve the defendant of an obligation of conduct toward him, and to take his chance of injury from a <u>known risk arising from what the defendant is to do or leave undone</u>." Cynergy argues that, properly read, the policy does not actually

12

exclude coverage under this scenario — or, in the alternative, that any such purported exclusion is impermissible under Georgia law.

In support of its position, Cynergy first maintains as a matter of textual interpretation that the phrase "other matters" cannot include the lack of a right of access, because the policy fails to list that specific condition alongside "defects, liens, encumbrances, [and] adverse claims." As Cynergy puts it: "Had First American wanted to list an additional exclusion for lack of access that is assumed, it could have written the policy differently to include that event among those specifically enumerated." But of course, the phrase "other matters" would have no meaning if it did not refer to anything beyond the four examples that precede it. Cynergy's reading of this provision, which would limit the matters covered by the exclusion to the four enumerated examples, therefore is untenable. The plain language of the policy is clear: losses of any type arising from matters that have been "assumed" by the insured claimant are not covered. While these matters include defects, liens, encumbrances, and adverse claims, they are not limited to those examples.

Cynergy next objects that under the district court's interpretation of the exclusion, as Cynergy sees it, the policy purports to cover losses caused by the lack of dedicated access while simultaneously negating coverage for those same

13

losses under the "other matters" exclusion.  But that is the nature of an exclusion — to exclude things that otherwise would be covered, when certain conditions are met.  The policy does not exclude all losses stemming from a lack of dedicated access, merely those that were assumed by the insured.  The exclusion therefore does not "eviscerate" coverage under the policy, as Cynergy asserts, and this case is unlike the decisions that Cynergy cites in which exclusions were found to impermissibly subsume a policy's affirmative grant of coverage.  Those decisions simply recognize that, under Georgia law, an insurance policy may not purport to offer coverage that inevitably will be defeated by one of the policy's exclusions — in other words, the policy may not offer coverage that is chimerical.  See Hooters of Augusta, Inc. v. Am. Global Ins. Co., 272 F. Supp. 2d 1365, 1378 (S.D. Ga. 2003) ("Read fairly, the Endorsement completely abrogates the coverage provided in the same document because every advertisement would be excluded by it. . . . When an exclusion completely nullifies the coverage provided in a policy, that exclusion has no effect[.]" (citing Isdoll v. Scottsdale Ins. Co., 466 S.E.2d 48, 50 (Ga. Ct. App. 1995))) (emphasis added); Transp. Ins. Co. v. Piedmont Const. Group, LLC., 686 S.E.2d 824, 828 (Ga. Ct. App. 2009) ("Transportation's proposed interpretation of the business-risk exclusion 'would make coverage for such actions merely illusory, despite the fact that such coverage is expressly

14

provided for in the policy.'" (quoting Isdoll, 466 S.E.2d at 50)) (emphasis added). In contrast to the provisions addressed in those cases, this dispute involves a policy exclusion that exempts certain claims from coverage — no more and no less. Cynergy's unhappiness that the exclusion is triggered by the undisputed facts underlying this particular case does not transform the provision into anything else.

Taking a different tack, Cynergy next argues that contrary to the district court's reasoning, the Bank's knowledge and appreciation of the access issue is "irrelevant" to the coverage question, "because First American gave written assurances there was access." What Cynergy appears to mean by this is that First American, when issuing the policy, was obliged to comply with a Georgia statute providing that title insurance contracts "shall be written only upon evidence or opinion of title obtained and preserved by the insurer." Ga. Code Ann. § 33-7-8. First American satisfied that obligation, however, by relying on evidence of title supplied by its issuing agent, James Roberts, and the validity of title has never been an issue in this case. Contrary to Cynergy's suggestion, Section 33-7-8 of the Georgia Code speaks only to evidence of title and imposes no requirements

15

regarding the accuracy of an insurer's understanding about a property's dedicated access, easements, and other such matters.[2]

Further to its argument under the Georgia Code, Cynergy analogizes this case to a Georgia decision, Fid. Nat. Title Ins. Co. v. Matrix Fin. Servs. Corp., 567 S.E.2d 96 (Ga. Ct. App. 2002), in which an identical policy exclusion was held inapplicable. The analogy fails. In Matrix, a lender sought to recover on a title insurance policy after defects in the title of the property came to light. Id. at 99. Among the insurer's many unavailing arguments against coverage was its contention that the lender "assumed, or agreed to" the loss that it incurred. Id. at 100. Specifically, the insurer argued that if the lender had "properly investigated" and "performed an adequate property title search," it would have discovered the defects in the title before it closed the loan. Id. at 101. According to the insurer, the lender "should never have closed" the loan, and "by doing so, it created its own loss." Id. In sum, the insurer contended that the lender "negligently created

---

[2]    Cynergy complains that an authorization request form completed by Roberts's firm for First American erroneously indicated that the Retreat property had dedicated access. But Cynergy has not explained how the mistake made by Roberts's firm has any bearing on the validity or interpretation of the exclusions in the title insurance policy. It was not illogical for First American to have issued this policy while knowing that the property lacked dedicated access, so long as the title was valid. Nor has Cynergy pointed to any rule prohibiting First American from doing so.

16

its own title problems and cannot legally or equitably seek coverage under the policy." Id.

The Court of Appeals of Georgia rejected this argument. It stated that the insurer was simply second-guessing the wisdom of the lender's business decisions, and that, regardless of what circumstances may have existed at the time of the loan to raise the lender's suspicions about the title, these circumstances did not affect the insurer's promise to insure the lender's interest in the property. Fid. Nat. Title Ins. Co., 567 S.E.2d at 101. The court went on to note that under Section 33-7-8 of the Georgia Code, the insurer, not the lender, "was responsible for obtaining the evidence to support its title opinion." Id. The lender's "failure to discover" the evidence of a title defect before closing therefore had no bearing on the insurer's obligations. Id.

Here, by contrast, First American does not allege that the Bank, with proper diligence, would have discovered the property's lack of dedicated access before extending the loan or that the Bank was obligated to undertake such an investigation. Instead, it alleges (and furnishes evidence) that the Bank actually knew about the lack of access and fully understood the effect of this fact on the property's value before it made the loan. Although Section § 33-7-8 puts the onus on insurers to obtain evidence of the validity of title before issuing a policy,

17

Cynergy identifies no similar obligation requiring First American to obtain evidence that the land did or did not have a dedicated right of access, or anything prohibiting First American from issuing the policy unless such access existed.

The district court correctly interpreted the terms of the title insurance contract. Accordingly, we move on to the question of whether genuine issues of material fact preclude summary judgment in First American's favor.

## B.  Summary Judgment

As the preceding discussion establishes, First American is not liable under the terms of the title insurance policy if Farmers State Bank was aware of the Retreat property's lack of a dedicated right of access and appreciated its effect when the Bank extended the loan and took out the insurance policy. The district court found that the evidence conclusively demonstrated that the Bank indeed had such knowledge and understood its significance. There being no genuine disputes of fact about this, the court concluded that summary judgment for First American was appropriate. Having reviewed the matter de novo, we agree.

### 1.  Admissibility of the Leverett Affidavit

In the district court's reckoning, as in ours, the critical piece of evidence demonstrating that the Bank "assumed" the Retreat property's lack of dedicated access is the affidavit of George C. Leverett III, the Bank's former president and

18

the officer who originated the Retreat loan.  Given the significance of the affidavit to the outcome of this case, we must address Cynergy's contention that the affidavit would have been inadmissible at trial and therefore should not have been considered by the district court at summary judgment.  As an evidentiary ruling, the district court's determination is reviewed for abuse of discretion and should be affirmed unless the court made a "clear error of judgment" or applied an "incorrect legal standard."  Conroy, 375 F.3d at 1232 (quoting Piamba, 177 F.3d at 1306).

Leverett's affidavit, which was executed at First American's request, was signed on October 1, 2009, at which point First American was investigating Cynergy's policy claim but had not yet denied it.  At the time, Leverett was still the Bank's president, but he was undergoing treatment for cancer.  He died in early April 2010, before the affidavit was ever produced in discovery for this lawsuit.  Cynergy argued to the district court that the affidavit constituted inadmissible hearsay.  The court disagreed, concluding after careful analysis that the affidavit was admissible under Rule 807 of the Federal Rules of Evidence.  This "catch-all exception to the hearsay rule" permits admission of a hearsay statement "if it is particularly trustworthy; it bears on a material fact; it is the most probative evidence addressing that fact; its admission is consistent with the rules of evidence and advances the interests of justice; and its proffer follows adequate

19

notice to the adverse party." United States v. Rodriguez, 218 F.3d 1243, 1246 (11th Cir. 2000); see Fed. R. Evid. 807.

Cynergy does not challenge any part of the district court's Rule 807 analysis. Instead, Cynergy argues that the court failed to make one of the findings that it was required to make under the Rule — that the affidavit "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(3). This contention is belied by the district court's discussion of the affidavit, during which the court separately addressed each prong of Rule 807(a) and stated that the affidavit speaks "directly and comprehensively" to "a key issue for which very little alternative evidence exists," further observing that "the need for the statements is great because the Bank's knowledge is the fulcrum upon which liability turns, but evidence on this point is scant." We conclude that the district court made the necessary finding under Rule 807(a)(3), and we agree that the criterion established by that provision is satisfied here.

Cynergy also maintains that the district court's consideration of the Leverett affidavit violated Rule 807(b), which permits a hearsay statement to be admitted "only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including

20

the declarant's name and address, so that the party has a fair opportunity to meet it." Fed. R. Evid. 807(b). According to Cynergy, it was impermissible for the district court to consider the affidavit because First American did not provide notice to Cynergy before Leverett's death of its intent to offer the affidavit.[3]

First American disputes Cynergy's interpretation of Rule 807(b), arguing that it supplied notice of its intent to rely on the affidavit well before any "trial or hearing," as required by the Rule, and that First American had no obligation to ensure that such notice was provided before Leverett passed away. Indeed, First American scarcely could have done so, because Leverett was already deceased by the time that Cynergy filed this lawsuit in late April 2010. Cynergy offers no authority (and we are aware of none) precluding the district court's consideration of the affidavit for the purposes of summary judgment based on a lack of notice under these circumstances. Cynergy was provided with the affidavit months before briefing on the dispositive motions took place.[4] The notice requirement "is

---

[3]    First American maintains that Cynergy waived this argument by failing to raise it in the district court. But it was not until First American's reply brief in support of its motion for summary judgment that it first suggested, in response to Cynergy's hearsay objection, that the affidavit could be admitted under Rule 807. No hearing was held on the motion for summary judgment during which Cynergy could have countered with its notice argument. We therefore do not regard the argument as waived.

[4]    The affidavit was used as an exhibit during the depositions of Antonakos and Lee six months before First American moved for summary judgment.

21

intended to afford the party against whom the statement is offered sufficient opportunity to determine its trustworthiness in order to provide a fair opportunity to meet the statement." United States v. Evans, 572 F.2d 455, 489 (5th Cir. 1978) (discussing predecessor Rule 803(24)); see also United States v. Munoz, 16 F.3d 1116, 1122 (11th Cir. 1994). It does not create a categorical ban on the admission of statements made by deceased persons. Nor does it impose what in this case would be the functional equivalent: a requirement that a defendant supply notice of its intent to offer a statement at trial before the plaintiff has even filed suit.

The district court's conclusion that the affidavit would be admissible at trial was not an abuse of discretion.

### 2. Genuine Issues of Material Fact

The evidence demonstrates that Farmers State Bank was fully aware of the Retreat property's lack of dedicated access when it extended the purchase loan and took out the insurance policy from First American. No reasonable factfinder could conclude otherwise. Because there are no genuine issues of material fact in dispute, and because First American is entitled to judgment as a matter of law, summary judgment was appropriate.

The sworn affidavit of former Bank president George Leverett leaves no doubt that the Bank understood the Retreat property to lack a dedicated right of

22

access and appreciated the impact of this condition on the land's marketability. The statements made in Leverett's affidavit are supported by attendant circumstances surrounding the loan — most notably that the Bank required additional collateral for the loan, beyond the deed to the property itself, to offset the potentially diminished resale value of the land. Leverett's statements derive further credence from overwhelming evidence showing that the principal investors in the Retreat were aware of the lack of access before purchasing the land but — just as Leverett attests — had planned on surmounting this obstacle by obtaining an easement over adjacent property. Leverett's affidavit, supported by these indicia of reliability, is uncontradicted by any other evidence.

> The key portion of Leverett's affidavit reads as follows:

> At the application stage of this land acquisition loan, Mr. Tommy Lee made a presentation to me about his future property development plans. At that time I was aware that the tract appeared to be landlocked, but I was told by Tommy Lee of Retreat LLC that he was pursuing and expected to obtain an access easement to Highway 378 for their future development plans.

Cynergy depicts this passage as "vague and equivocal" because it states only that the tract "appeared to be landlocked," but we do not accept this characterization. As the affidavit's next paragraph makes clear, a conclusive determination about

23

the property's access was unnecessary to the Bank, as it was extending only a short-term purchase loan for the land, not for its development:

> FSB was not financing the planned development on the Property; the FSB loan was strictly for the acquisition of the Property. Thus, obtaining adequate collateral on the loan was more important to FSB than the issue of how the property would be accessed for purposes of Retreat LLC's planned development.

What mattered to the Bank, in other words, was not whether or not the property truly lacked dedicated access, as it appeared, but that the Bank obtain adequate security for its loan.

That is exactly what the Bank did. Not satisfied with a promissory note and a deed to the property itself, the Bank required additional security as collateral from the principal investors in the Retreat: personal guarantees from Antonakos and Lee, along with deeds to a residential property owned by Lee and a commercial property owned by other Retreat members. As the district court observed, the Bank's insistence on these terms is an attendant circumstance indicating that the Bank knowingly acquiesced to the property's lack of dedicated access and took the precautions necessary to safeguard its interests in light of this consideration.

Were there any doubt about how to interpret the statements made in Leverett's affidavit, it would be dispelled by notes that the Bank's vice president,

24

Maria Bradford, took to memorialize a telephone conversation she had with Leverett two months before the affidavit was executed.  At the time of this conversation, First American was conducting its investigation into Cynergy's policy claim; Leverett, although still the Bank's president, was not coming into the office every day because of his illness, and so Bradford acted as a "messenger" to relay to him the inquiries that were being made about the Retreat loan.  Bradford's notes of her conversation with Leverett — which were taken for her own future reference — describe Leverett as saying, in substance, that "since we had other collateral securing this loan and this loan was to be a short term 6 month acquisition loan only, the final outcome of public access to the property was not our primary concern."

In her deposition, Bradford explained why the Bank would have been willing to extend the loan despite the property's lack of access: the Bank had "our major collateral . . . the collateral was Tommy's home, a second mortgage on Tommy Lee's home and acreage.  We had other collateral."  As the closing attorney for the sale, James Roberts, stated in his own deposition, such an arrangement to secure a loan for land that lacked dedicated access was hardly

25

noteworthy, because banks issue such loans "if they feel that they have adequate collateral."[5]

Further support for Leverett's attestations comes from evidence showing that the investors behind the Retreat — or at least Tommy Lee, who was tasked with responsibility over the matter — were well aware of the property's lack of a right of access before their purchase. Although the knowledge held by the Bank, not the Retreat, is the dispositive issue under the insurance policy, the Retreat's undeniable knowledge lends credence to Leverett's account of having been apprised by Lee both of the access problem and how the Retreat was planning to solve that problem through an easement.

The previous owner of the Retreat property, Emily Hester, has attested to the fact that the primary reason she sold the property was because it lacked a dedicated right of access. She further stated that this issue was discussed among

---

[5]    Additional documentary support for the account set forth in Leverett's affidavit can, perhaps, be found in a letter written under his supervision in March 2009 to Dean Antonakos. In this letter, the Bank's executive vice president, J. Bruce Turner, told Antonakos: "When we originally made this loan, we knew that there was no designated access to the property, but it was in your plans to create one from Highway 378." Cynergy points out, however, that portions of Turner's deposition suggest that Turner was referring here not to the Bank's knowledge about the legal question of whether the property had a dedicated right of access, but rather to the logistical matter of creating a usable entrance to the property, which was being discussed by the Bank and the Retreat as they negotiated an extension of the loan. Because Turner's letter is — at most — simply one additional piece of corroborating evidence confirming the account set forth in Leverett's affidavit, our conclusion would be the same even if we gave no weight to Turner's March 2009 letter.

26

the parties prior to the sale, that the Retreat used this fact during negotiations to obtain a lower purchase price, and that an agent of the Retreat told her before the closing that the lack of access was not an issue because the Retreat could get an easement across the Army Corps of Engineers' adjacent land. The seller's real estate agent, Irma Conrad, likewise testified that she discussed the lack of access with the Retreat's real estate agent, Clay Turner; that the lowered purchase price reflected the property's lack of access; and that the Retreat was not concerned due to its plans to obtain an easement. Clay Turner himself has attested: "I was aware that the Property was landlocked with no road frontage or easement access and discussed this fact with Mr. Lee and Mr. Antonakos when they were considering purchasing the property." Confirming these accounts, Mr. Turner wrote a letter to the seller listing several "obstacles that have to be considered with the purchase of this property" which, according to the letter, justified the price and terms offered by the Retreat. The first of the "concerns" listed in Turner's letter is that "the property is currently land locked with no right of way for access. This is an issue that we feel confident that we could resolve given an appropriate option period of 180 days for which we have asked."

Indeed, Tommy Lee has admitted that he was told by Clay Turner about the property's lack of access and that although he had heard "rumors" of an existing

27

easement, no one from the Retreat ever determined before the sale whether or not these rumors were true.  Upon being informed by Turner that the property appeared to lack access, however, Lee, in his own words, "told him to use that to try to get the price reduced."  This evidence firmly supports Leverett's account of his own understanding, before the loan was made, about the property's lack of dedicated access and of his discussions with Lee about the matter.

All of the evidence in this case tells a consistent story, and in light of this evidence, no reasonable factfinder could doubt that the Bank was aware of the Retreat property's lack of dedicated access and appreciated its significance.  The Bank therefore "assumed" that condition, within the meaning of the title insurance policy, and First American is entitled to summary judgment.  Because we affirm the district court on the same grounds upon which it relied, we have no need to address First American's many alternative arguments for affirmance.

AFFIRMED.

28