[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-11893
_____

D.C. Docket No. 1:10-cv-00773-JOF


DR. JEANNIE BLOM,

Plaintiff-Appellant,

versus

WELLSTAR HEALTH SYSTEM, INC.,
DR. RICHARD HART,

Defendants-Appellees,

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(March 27, 2014)

Before PRYOR and MARTIN, Circuit Judges, and GOLD,[*] District Judge.

PER CURIAM:

_____

[*] Honorable Alan Stephen Gold, United States District Judge for the Southern District of Florida, sitting by designation.

Dr. Jeannie Blom appeals the district court's grant of summary judgment in favor of her former employer WellStar Health System, Inc.  Specifically, she challenges the district court's rulings on her claims of gender discrimination and quid pro quo sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, and retaliation under the Family Medical Leave Act (FMLA), 29 U.S.C. § 2615(a).  After careful review and with the benefit of oral argument, we affirm.

I.

A.  FACTUAL BACKGROUND

Blom was hired by WellStar pursuant to an employment agreement in 2000.  She served as WellStar's Medical Director of the Cobb Hospital Rehabilitation Unit.  The employment contract provided that WellStar could terminate the agreement at any time without cause.

Hospital rehabilitation medicine is one of the most regulated and audited areas of medicine.  WellStar had concerns about three aspects of Blom's billing practices: (1) insufficient documentation of procedures; (2) coding above national benchmarks, which means her billing showed she was performing more time-consuming and expensive procedures more often than other physicians in her practice area across the country; and (3) billing through her own provider number when she was using another physician to cover her.  WellStar was particularly

2

concerned about Blom's practice of coding above national benchmarks because it believed that increased the likelihood of a time-consuming and expensive Medicare audit.

As to the first issue—inadequate documentation of services provided—in 2006 Blom failed a random coding audit. She then worked with various WellStar employees to improve her coding accuracy and documentation. She later received a very high audit score of 96%. There are emails showing she was very cooperative and receptive to feedback in this area and worked hard to improve, which WellStar does not dispute.

On the second issue—coding above national benchmarks—the record shows that Blom was resistant to change. During Blom's employment with WellStar, David Anderson was the Executive Vice President for Human Resources and Chief Compliance Officer and one of the decision makers for Blom's termination. He testified that Blom was consistently discussed at quarterly compliance meetings because her billing percentages for high-cost services were above national benchmarks. The emails between the parties that address this issue show that in comparison to her response to improving her audit scores, Blom was less receptive to change, and even defensive. In middle and late 2007 there was a meeting and correspondence about her national benchmark comparisons at which time WellStar insisted that she change her practices or face termination. This correspondence

also shows continuing problems with the third issue, Blom's practice of billing under her own provider number when she was away and other physicians were providing services to her patients.

Around this same time, Blom was also the primary care giver for several ill family members. Blom claimed WellStar interfered with her ability to care for these family members. In support of this claim, she offers her correspondence with WellStar about coverage issues, including one letter in which she claims she had arranged for coverage so that she could be with her father during a surgery but was still called to attend to matters at the hospital.

In February 2008, just before Blom's termination, WellStar's compliance hotline received an anonymous complaint that Blom was not fulfilling her duties and was falsifying documentation, both serious allegations of Medicare fraud. WellStar investigated the complaint and ultimately concluded that the allegations were unfounded because it could not tie any fraudulent coding or billing to any specific patients and Blom denied any wrongdoing. However, the investigation revealed other serious concerns about Blom's performance as Medical Director, including that:

- she did not typically come in during day time hours;
- when she came in she stayed on the unit an average of two to three hours and spent most of that time in her office;

4

- she was often not present during the discharge process, although the discharge summary requires a face-to-face patient encounter on the day of discharge;

- she sometimes came in at midnight and wrote a progress note for the current day and one for the next day, and then did not come back the next day;

- she "popped in" on patients but was rarely performing exams, although she often documented an exam on every patient;

- orders she wrote late in the evening caused the nurses to wake patients up, transfuse at night, etc., interrupting the nurses' normal routine;

- she did not always meet with her entire team on team conference day;

- she often arrived one to three hours late for team conferences, and two of the four team conferences scheduled in January did not occur;

- when she was late or cancelled team conferences it affected the work of the therapists and social workers because they could not schedule therapy during that time;

- staff seemed dejected and resigned, and some fearful about answering questions; and

- taken together, these matters raised serious concerns about whether her billing and documentation were appropriate.

5

Bruce Harrison, WellStar's Senior Vice President of Physician Services and the other decision maker in this case, communicated some of these concerns to Blom by letter in February 2008.

During her employment with WellStar, Blom had an affair with a senior WellStar employee, Dr. Richard Hart. The affair ended in 2006 about two years before Blom was fired. When the affair started, Hart was WellStar's Medical Director for the Physicians Group. That position involved being the point person for physicians in or joining the WellStar group. While he was in that position, he and Blom began having lunch because she was having problems working with the directors of rehabilitation at WellStar's other hospitals. Blom claims that during the affair Hart told her that he was protecting her from people who sought to harm her career and that she would experience difficulties at WellStar without his protection.

In 2004 Hart was appointed to be Medical Director at WellStar's Douglas and Paulding Hospitals. As a result, from 2004 forward he did not have medical director responsibilities at Cobb Hospital where Blom worked.

Neither Blom nor Hart disclosed their affair to anyone at WellStar. Prior to the decision to terminate Blom's employment contract, decision makers Anderson and Harrison did not know about the affair.

6

Blom claims, relying on her own affidavit, that in March 2008, about two weeks before she was terminated, Hart began calling her although they had not spoken for almost two years. She testified to a number of specific statements that Hart made about how she was being discriminatorily treated based on her gender and set-up to be fired because the men at WellStar were jealous of her success. Blom further testified that Hart said he could help her, but that he had to "get together" with her first. Based on their communications during their affair, Blom interpreted this phrase as Hart asking her for physical intimacy in exchange for his help.

WellStar contends that after the hotline investigation, Anderson concluded that Blom was a compliance risk and that she had failed to conduct herself in a manner consistent with WellStar's expectations for a medical director. Based on these conclusions, he recommended that WellStar terminate Blom's employment contract. Harrison followed Anderson's advice and terminated Blom's employment agreement without cause on March 19, 2008.

## B.  PROCEDURAL HISTORY

Blom filed suit against WellStar and Hart in March 2010. After discovery, Hart filed for summary judgment, which Blom did not contest. WellStar also moved for summary judgment and the district court granted judgment to WellStar on all counts. Blom now appeals the district court's order as to three of her

original claims against WellStar: (1) Title VII gender discrimination for her

termination; (2) retaliation under FMLA; and (3) quid pro quo sexual harassment.

## II.

We review de novo the district court's grant of summary judgment. Skop v.

City of Atlanta, 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment is

appropriate only when "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In

making this determination, we view the evidence and all factual inferences in the

light most favorable to the non-moving party. Skop, 485 F.3d at 1136.

"The district court's evidentiary rulings are reviewed for abuse of discretion

and will be reversed only if an erroneous ruling resulted in substantial prejudice."

Cynergy, LLC v. First Am. Title Ins. Co., 706 F.3d 1321, 1326 (11th Cir. 2013)

(internal quotation marks omitted). "This Court will affirm such rulings unless the

district court has made a clear error of judgment or has applied an incorrect legal

standard." Id. (internal quotation marks omitted).

## III.

### A.    TITLE VII GENDER DISCRIMINATION

Blom appeals the grant of summary judgment for WellStar on her Title VII

gender discrimination claim, arguing that she sufficiently rebutted each of

WellStar's proffered reasons for her termination and demonstrated a material

dispute of fact as to whether she was the victim of intentional discrimination.  Title VII prohibits employment discrimination on the basis of sex.  See 42 U.S.C. § 2000e-2(a).  In cases involving circumstantial evidence of discrimination we apply the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).  Under McDonnell Douglas a plaintiff must first establish a prima facie case of discrimination.  Holland v. Gee, 677 F.3d 1047, 1055 (11th Cir. 2012).  Then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  Id.

If the employer identifies a legitimate, nondiscriminatory reason for its decision, the burden shifts back to the plaintiff to demonstrate that the proffered reason was not the true reason for the employment decision.  Id.  The plaintiff "cannot recast the reason but must meet it head on and rebut it."  Id. (quotation marks omitted).  At this stage, the plaintiff's burden of rebutting the employer's proffered reasons also merges with the plaintiff's ultimate burden of persuading the finder of fact that she has been the victim of intentional discrimination.  Id. at 1056.  The dispositive issue in this case is this final step—whether Blom adequately rebutted each of WellStar's reasons for her termination and presented sufficient evidence that would allow a reasonable jury to conclude WellStar was motivated by discrimination.  Id.

WellStar relied on three legitimate nondiscriminatory bases for Blom's termination:  (1) concerns about Blom's coding; (2) performance issues that came to light during the hotline investigation; and (3) concerns that Blom was a compliance risk and behaved in ways that were inconsistent with being a medical director.  Blom must rebut each of the reasons to survive a motion for summary judgment.  Chapman v. AI Transp., 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc).

Blom's main argument is that WellStar's reasons for her termination and the testimony of WellStar employees about these reasons are contradicted by WellStar's own documents.  Based on this, Blom claims the district court improperly made credibility determinations and failed to view the evidence in the light most favorable to her.  Our review of the record does not support this claim. Although Blom arguably has identified some conflicts and inconsistencies, they do not relate to WellStar's main concerns.  Neither does she point to any significant evidence of gender bias to allow an inference that discrimination was the true motivation for WellStar's actions.

First, Blom fails to present evidence that WellStar's concerns about her coding practices were pretextual.  In discussing this reason for her termination, Blom focuses almost entirely on her audit scores.  But correspondence between the parties shows that WellStar was not concerned with Blom's audit scores.  It was

10

her coding above national benchmarks that was WellStar's focus. This correspondence also demonstrates that Blom knew about WellStar's concerns but felt her billing practices were valid and she resisted changing them.

In rebuttal Blom argues that an inference of pretext can be drawn from the fact that WellStar departed from its usual practice of deferring to its coding and compliance experts, who had recommended conducting an external peer review of Blom's billing. See Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1299 (11th Cir. 2006) ("[A]n employer's deviation from its own standard procedures may serve as evidence of pretext[.]"). However, the record does not reflect that WellStar had a usual practice of deferring to its coding experts or conducting external peer reviews before making personnel decisions. It only shows that Anderson testified that his coding staff would know the answers to technical questions that he could not answer, such as the criteria for being identified as coding above national benchmarks. The fact that WellStar did not have a usual practice in a situation like Blom's is further demonstrated by the fact that she was the only physician regularly discussed and finally terminated for compliance-related issues during Anderson's tenure at WellStar.

While Blom's failure to rebut WellStar's concerns about her national benchmark comparisons is sufficient alone to support judgment in favor of WellStar, Blom also fails to rebut WellStar's concerns that came to light after the

11

hotline investigation.[1]  Although there was no ultimate finding of wrongdoing, the investigation, which included interviews with sixteen members of Blom's department, raised serious concerns about her performance as Medical Director.

Rather than directly address these concerns, Blom argues that a jury could draw inferences from Harrison's February 2008 letter—sent right before her termination—that would allow them to conclude that WellStar was not genuinely concerned about the hotline complaint investigation.  She argues first that the fact that Harrison attached a new employment contract for her to sign, even after the investigation was mostly complete, suggested that he was not genuinely concerned.[2]  Second, she argues that Harrison's letter says he would raise "any additional concerns" that come out of the investigation with her at a later date, but never did.

In contrast to Blom's view, our review of the record indicates that Harrison was genuinely concerned about the investigation.  Harrison's letter voices unambiguous concern when he states, "I want to take this opportunity to ensure

---

[1] Because we conclude Blom failed to rebut WellStar's first two reasons for her termination, we do not consider WellStar's third proffered rationale for its decision.  See Chapman, 229 F.3d at 1037.

[2] Blom also argues that a reasonable jury could find pretext because Anderson testified that none of his concerns were violations of Blom's contract.  This argument distorts the nature of the parties' employment contract.  Although the contract did set forth some specific situations in which the contract may be terminated for cause—such as revocation of the physician's medical license—it also permitted either party, without cause, to terminate with 90-days notice, as was done here.

that there is no uncertainty related to various issues which have recently arisen related to your services provided to the inpatients of the Cobb Hospital Rehab Unit." The letter also echoes some of the problems raised by the hotline complaint investigation, including concerns about Blom's hours and attendance at team conference meetings.

Neither does the record support Blom's characterization of the letter as offering her a new employment contract. The letter says: "it has come to my attention that you have not executed the Amended and Restated Physician Services Agreement and Medical Director letter agreement which were provided to you last year." In asking her to sign and return the last contract on file, Harrison's letter was not inviting Blom to extend her employment with WellStar, but rather addressing her failure to sign and return the contract from last year.

The record also contradicts Blom's other claimed inference—Harrison's failure to raise "any additional concerns which may arise from the investigation." WellStar terminated Blom's contract less than three weeks after Harrison's letter, during which time WellStar did raise its concerns with Blom by meeting with her to discuss the hotline investigation and informing her of her termination.

Blom also fails to present sufficient evidence that would allow a jury to find that she was the victim of discrimination. On this point Blom offers the following evidence: (1) WellStar did not terminate or discipline a number of male physicians

13

who also failed audits; and (2) Hart's statements to her provided evidence of WellStar's gender bias.

First, as to the comparator evidence, Blom argues the district court erred in concluding that her proffered male comparators were not similarly situated.  In rejecting Blom's thirteen male comparators, the district court found "there is no evidence in the record that they also had problems with national benchmarks, that their supervisors found them to be uncooperative, or that a complaint had been made against them to the compliance hotline."

The fact that Blom had additional areas of friction with WellStar and was not just fired for coding issues makes these other physicians, who we only know are male and failed audits, inappropriate comparators.  Rioux v. City of Atlanta, 520 F.3d 1269, 1280 (11th Cir. 2008) ("The quantity and quality of the comparator's misconduct must be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." (internal alterations and quotation marks omitted)).  Also, Blom's comparator evidence yet again focuses on audit results, not national benchmark comparisons. As a result, even putting aside Blom's cooperation and performance issues, her comparators are inadequate because she did not offer evidence of male doctors who were not fired despite coding above national benchmarks.

14

Second, Blom argues that the district court failed to consider evidence of WellStar's gender bias by improperly excluding Hart's statements, which Blom offered through her own affidavit.  Blom argues Hart's statements are admissible as non-hearsay under Federal Rule of Evidence 801 as a statement "offered against an opposing party" and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed."  Fed. R. Evid. 801(d)(2)(D); see also Miles v. M.N.C. Corp., 750 F.2d 867, 874–75 (11th Cir. 1985) (finding statement made by employee with influence over employment decisions was admissible under Rule 801(d)(2)(D)).  The district court rejected this argument because there was no record evidence showing Hart's "position was of such rank or importance or that he was so involved with the decisionmaking process for [Blom's] termination that any comment by him could be considered the admission of a party opponent."

We find no abuse of discretion in the district court's finding.  Although in some situations an employee may testify about statements made by his supervisor regarding company policy toward a protected group of employees, Blom's attempt to rely on the double-hearsay statements in her affidavit fails because there is no evidence that Hart was her supervisor or had authority to speak for WellStar on personnel matters.  Zaben v. Air Products & Chemicals, Inc. 129 F.3d 1453, 1456–57 (11th Cir. 1997).  At the time of his alleged statements, Hart was the Medical

Director at two hospitals where Blom did not work. Blom also admitted they had not spoken in nearly two years. In her deposition Blom testified only that she "would assume" the decision makers were interacting with Hart. Because of her failure to offer evidence that Hart was her supervisor or that he had authority to speak for WellStar on personnel matters related to her, we see no error in the district court's ruling.

Because we conclude that Blom has failed to present evidence that would allow a jury to conclude that WellStar's reasons for her termination were pretextual or motivated by gender bias, we affirm the grant of summary judgment on her Title VII gender discrimination claim.

## B.    FMLA RETALIATION

Blom also claims the district court erred in granting judgment for WellStar on her FMLA retaliation claim, relying on the same arguments and evidence of pretext that she presented in defense of her Title VII gender discrimination claim. We similarly conclude that she has failed to rebut and show pretext as to WellStar's proffered reasons for her termination, and therefore affirm the grant of summary judgment on this claim.

## C.    Quid Pro Quo Sexual Harassment

Lastly, Blom challenges the district court's finding that she did not establish causation for her quid pro quo sexual harassment claim. Because Blom has not

established a material dispute of fact as to whether Hart was her supervisor or a decision maker who could influence her employment, she has not shown a sufficient causal link between Hart's conduct and WellStar's termination decision to create a jury question.  See Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1312 (11th Cir. 2001) (affirming grant of summary judgment where Frederick failed to present sufficient evidence to establish any causal link between the adverse tangible employment action she suffered and the alleged harassment). We therefore affirm the grant of judgment for WellStar on Blom's quid pro quo sexual harassment claim.

III.

For these reasons, the district court's order is **AFFIRMED.**