******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# PAUL HARRIGAN *v.* FIDELITY NATIONAL TITLE INSURANCE COMPANY
## (AC 44424)

Alvord, Alexander and Vertefeuille, Js.

*Syllabus*

The plaintiff property owner sought to recover damages from the defendant title insurance company for an alleged violation of the Connecticut Unfair Trade Practices Act (CUTPA) (§ 42-110a et seq.), based on a violation of the Connecticut Unfair Insurance Practices Act (CUIPA) (§ 38a-815 et seq.), in connection with a title insurance policy issued by the defendant to the plaintiff. The plaintiff brought the present action after protracted negotiations between the parties regarding the value of the plaintiff's claim as to a disputed property title. The plaintiff alleged that the defendant engaged in unfair and deceptive acts or practices in its administration of the policy and in its handling of the plaintiff's claim. Following a trial, the trial court found that the plaintiff had failed to demonstrate any unfair claim settlement practices under CUIPA by the defendant. On appeal, the plaintiff claimed, inter alia, that the evidence he presented at trial established that the defendant's unfair practices in failing to acknowledge and act with reasonable promptness upon communications with respect to his claim, in violation of the applicable provision (§ 38a-816 (6) (B)) of CUIPA, were part of a general business practice by the defendant, as required under § 38a-816 (6). *Held* that the trial court correctly rendered judgment in favor of the defendant with respect to the CUTPA claim, as the plaintiff, having failed to establish a general business practice of delaying communications by the defendant, failed to set forth a valid CUIPA claim, which was fatal to the plaintiff's CUTPA claim: the evidence presented by the plaintiff did not establish the existence of a general business practice by the defendant for purposes of § 38a-816 (6), as the cases relied on by the plaintiff to show a general business practice were factually distinguishable and had questionable evidentiary value in light of their differences, and the plaintiff failed to present any testimony or other documentary evidence relating to the alleged business practice of the defendant; moreover, the delays in the plaintiff's case were caused by both the plaintiff and the defendant, and, although some delays resulted from corporate inefficiencies and mismanagement by the defendant, a fair portion of the delays in the present case were due, in part, to other causes, including the plaintiff's own delayed responses to communications and his insistence on receiving compensation for the potential relocation of a replacement septic system, an issue that prolonged the negotiations and that the court ultimately found to be of tenuous relevance to the diminution in value of the property.

Argued February 3—officially released September 6, 2022

*Procedural History*

Action to recover damages for, inter alia, a violation of the Connecticut Unfair Trade Practices Act, based on a violation of the Connecticut Unfair Insurance Practices Act, in connection with a title insurance policy issued by the defendant to the plaintiff, and for other relief, brought to the Superior Court in the judicial district of New Haven and tried to the court, *Abrams, J.*; judgment for the defendant, from which the plaintiff appealed to this court. *Affirmed.*

*Edward M. Schenkel*, for the appellant (plaintiff).

*Frank B. Velardi, Jr.*, for the appellee (defendant).

*Opinion*

VERTEFEUILLE, J. The plaintiff, Paul Harrigan, appeals from the judgment of the trial court, following a bench trial, rendered in part in favor of the defendant, Fidelity National Title Insurance Company, in connection with a title insurance policy (title policy) issued by the defendant to the plaintiff. On appeal, the plaintiff challenges the judgment in favor of the defendant only with respect to count two of the operative complaint, the third revised complaint, which alleges that the defendant's conduct in handling an insurance claim filed by the plaintiff pursuant to the title policy violated the Connecticut Unfair Insurance Practices Act (CUIPA); General Statutes § 38a-815 et seq.; and that such unfair and deceptive acts or practices of the defendant thereby violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Specifically, the plaintiff claims on appeal that (1) the court applied an incorrect standard in its analysis of whether the defendant violated CUIPA by requiring a finding of common-law bad faith by the defendant for the plaintiff to establish a violation of CUIPA, (2) when the proper standard is applied, the record sufficiently demonstrates that the defendant violated the relevant provisions of CUIPA, and (3) the evidence submitted by the plaintiff establishes that the defendant's unfair practices were part of a general business practice, as required under General Statutes § 38a-816 (6).[1] We affirm the judgment of the court, albeit on different grounds.

The court found the following facts in its memorandum of decision: "The plaintiff . . . is the owner of a 1.52 acre piece of residential property known as 27 Brook Road . . . in Woodbridge . . . . The western boundary of [the plaintiff's] . . . property abuts a piece of residential property known as 25 Brook Road. . . . The aforementioned properties known as 25 Brook Road and 27 Brook Road were once one parcel . . . . On September 29, 1969, Helen Greene transferred the properties to James [Weir] and Margery Weir. . . . On March 6, 1979, James Weir quitclaimed his interest in the properties to Margery Weir. . . . In 1998, Margery Weir subdivided the properties into parcels of relatively equal size and transferred the 25 Brook Road parcel to Woodbridge Country Homes. She retained ownership of the 27 Brook Road parcel. . . .

"The aforementioned transfer of the 25 Brook Road parcel from Margery Weir to Woodbridge Country Homes included an area approximately 0.2 acres . . . in size that runs along the boundary between the 25 Brook Road and 27 Brook Road properties and is shaped like a long, thin football . . . [disputed area]. This area is undeveloped, featuring trees and brush. . . . By warranty deed dated August 18, 1999, Woodbridge Country Homes transferred the 25 Brook Road

property, including the disputed area, to Ron [Nudel] and Debra Nudel. . . . By warranty deed dated July 23, 2008, Margery Weir transferred the 27 Brook Road property to [the plaintiff] . . . in this matter. The warranty deed's description of the 27 Brook [Road] property's boundary with the 25 Brook Road property lacks clarity, making it unclear whether the deed purports to transfer the disputed area to [the plaintiff]. . . .

"At the time of [the plaintiff's] purchase of the 27 Brook Road property, he was under a good faith belief that his purchase included the disputed area. . . . As part of the foregoing transfer, [the defendant] . . . issued [an] owner's title insurance policy . . . to [the plaintiff] in relation to his ownership interest in the 27 Brook Road property. . . . [The plaintiff] purchased the 27 Brook Road property with the intention of renovating and expanding the existing house on the property and then selling it. . . . In furtherance of [his] efforts to improve the existing house on the property, [the plaintiff] commissioned a survey that resulted in the creation of a site plan dated March 26, 2009. . . . Upon reviewing the site plan, [the plaintiff] first recognized that a potential issue existed regarding ownership of the disputed area, but he continued to possess a good faith belief that he held title to the area. . . .

"[The plaintiff] eventually completed a renovation that nearly doubled the size of the existing house on the 27 Brook Road property. He entered into a listing agreement with Coldwell Banker on May 20, 2011, marketing the property for $1.2 million . . . . During the period when [the plaintiff] had the 27 Brook Road property on the market, he contacted James Nugent, the attorney who represented him when he purchased the property, and inquired about whether issues regarding ownership of the disputed area could potentially interfere with a closing were he to secure a buyer. . . .

"Sometime in the late fall of 2011, [the plaintiff] conclusively learned that he did not, in fact, hold title to the disputed area. . . . By letter to [the defendant] dated December 3, 2011, [the plaintiff] made a claim upon his title insurance policy regarding the disputed area. . . . [The defendant] initially assigned Senior Claims Counsel Jeffrey Hansen to handle [the plaintiff's] claim. . . . By letter to [the plaintiff] dated January 5, 2012, [the defendant] acknowledged receipt of his claim. . . . By letter to [the plaintiff] dated February 3, 2012, [the defendant] essentially accepted his claim. At no time during the subsequent protracted negotiations between the parties regarding [the plaintiff's] claim did [the defendant] indicate any unwillingness to pay the claim. Rather, the issue between the parties always involved the claim's value. . . .

"[The defendant] subsequently decided to commission an appraisal designed to yield a figure representing the diminution in value of [the plaintiff's] property as

a result of the loss of the disputed area. . . . Subsequent to [the defendant's] decision to commission the appraisal, its personnel engaged in internal discussions regarding what date should be considered the date of loss upon which the diminution in value figure should be based. They attempted to reach out to [the plaintiff] regarding the issue without apparent success. . . . There is no evidence that [the defendant] actively pursued the possibility of purchasing the disputed area from the owners of 25 Brook Road. . . .

"The appraisal commissioned by [the defendant] eventually issued on June 5, 2012. It was prepared by Barbara Pape . . . [Pape appraisal] and quantified the property's [diminution in] value by virtue of the loss of the disputed area as $17,500, assigning the property a value of $332,000 with the disputed area and $314,500 without it. At [the defendant's] direction . . . Pape used March 26, 2009, as the date of loss, which was the date the plaintiff first recognized that a potential issue existed regarding ownership of the disputed area based on his review of the aforementioned site plan. . . .

"On July 6, 2012, [the defendant] forwarded to [the plaintiff] a copy of the Pape appraisal, together with a check in the amount of $17,500. Apparent difficulties arose surrounding delivery of the appraisal and the check, so [the plaintiff] did not receive them until several weeks later. . . . By letter to [the defendant] dated September 7, 2012, [the plaintiff] took exception, in great detail, to the methods . . . Pape employed in arriving at the [diminution in] value figure in her appraisal. . . . By letter dated October 10, 2012 . . . Pape responded to some of the concerns regarding her appraisal that [the plaintiff] raised in his September 7, 2012 letter. [The defendant] did not forward . . . Pape's letter to [the plaintiff] until December 22, 2012. . . . Over the next few months, the parties exchanged frequent correspondence in an attempt to reach an agreement regarding the [diminution in] value of the property. . . . One of [the plaintiff's] major concerns during this period was the alleged impact that the loss of the disputed area had on the property's septic system. While the evidence indicates that the [septic] system is not located in the disputed area, [the plaintiff] repeatedly expressed concern that the disputed area is the location where a replacement system could be most economically located in the event the current system needs to be replaced. . . .

"By letter dated March 13, 2013, [the defendant] informed [the plaintiff] that [it was] reassigning responsibility for his claim to Assistant Claims Counsel Cassandra Dorr. . . . By letter dated April 29, 2014, [the defendant] offered [the plaintiff] $29,500 to resolve his claim. . . . By email dated June 26, 2014, [the defendant] offered [the plaintiff] an additional $500. . . . At some point prior to February 4, 2015, [the plaintiff]

made a demand of $73,456 to resolve his claim. . . . In May, 2015, [the plaintiff] retained appraiser Charles Liberti to perform a diminution in value appraisal on the property. Around the same time, [the plaintiff] also retained Attorney Max Case to represent him [with] regard to his claim. . . .

"Liberti produced an appraisal dated February 10, 2016 . . . [Liberti appraisal], which quantified the property's [diminution in] value as $92,000 by virtue of the loss of the disputed area, assigning the property a value of $920,000 with the disputed area and $828,000 without it. At [the plaintiff's] direction . . . Liberti used December 3, 2011, as the date of loss, which was the date the plaintiff indicates that he conclusively learned that he did not own the disputed area and made his claim to [the defendant]. . . . Liberti did not factor in any issues regarding the septic system in arriving at the $92,000 [diminution in] value figure. He attributed the vast difference in the property values between the appraisals almost entirely to the significant improvements [the plaintiff] made to the property between the different dates of loss. . . .

"By letter dated March 21, 2016 . . . Case forwarded the Liberti appraisal to [the defendant] along with a demand of $92,000 to resolve the claim. . . . Not long thereafter, [the defendant] reassigned responsibility for [the plaintiff's] claim to Associate Claims Counsel Victoria Mack. . . . Between March . . . and November, 2016 . . . Case made repeated efforts to get [the defendant] to respond to . . . Liberti's appraisal and the accompanying $92,000 demand. . . . By email dated November 9, 2016, from . . . Mack to . . . Case, she informed him that part of the cause of [the defendant's] delay in responding was that the appraiser assigned to conduct a review of the Liberti appraisal had mistakenly reviewed, and found fault with, the Pape appraisal instead. . . . Subsequent correspondence reveals that [the defendant] concluded that there were problems with both the Pape appraisal and the Liberti appraisal. As a result, it commissioned a third appraisal performed by Robert Marsele. . . . By letter dated December 2, 2016, [the defendant] informed [the plaintiff] that it had reassigned responsibility for his claim to Associate Claims Counsel Robert Fregosi. . . .

"On February 13, 2017 . . . Marsele produced an appraisal that quantified the property's [diminution in] value as $25,000 by virtue of the loss of the disputed area, assigning the property a value of $335,000 with the disputed area and $310,000 without it. At [the defendant's] direction . . . Marsele used March 26, 2009, as the date of loss, which was the date the plaintiff first recognized that a potential issue existed regarding ownership of the disputed area based on his review of the aforementioned site plan. . . .

"By letter from . . . Fregosi to . . . Case dated

March 14, 2017, [the defendant] offered $31,000 to settle the claim and took issue with the December 3, 2011 date of loss contained in the Liberti appraisal. . . . By letter from . . . Case to . . . Fregosi dated April 24, 2017, [the plaintiff] renewed his demand of $92,000 and took issue with the March 26, 2009 date of loss contained in the Pape and Marsele appraisals. . . . By email from . . . Fregosi to . . . Case dated June 5, 2017, [the defendant] offered $40,000 to settle the claim. . . . By letter from . . . Fregosi to . . . Case dated August 7, 2017, [the defendant] offered $50,000 to settle the claim. . . . By letter from . . . Case to . . . Fregosi dated August 24, 2017, [the plaintiff] lowered his demand. It is unclear from the letter whether the new demand was $77,000 or $87,000. Regardless . . . Fregosi refused the demand by email to . . . Case dated October 2, 2017. . . . The plaintiff brought this [action] against [the defendant] by complaint dated November 13, 2017.''

In a third revised complaint, the plaintiff alleges four counts against the defendant. The second count, which alleges a violation of CUTPA, is the only count at issue in this appeal.[2] In count two, the plaintiff alleges that ''[t]he defendant is involved in the trade or commerce of [providing] title insurance coverage to individuals and entities who hold title to real property'' and that ''[t]he defendant engaged in unfair and deceptive acts or practices in its administration of the [title] policy and handling of the plaintiff's claim . . . in violation of . . . [CUIPA] . . . .'' The defendant's alleged unfair and deceptive acts included, but were not limited to, the following: ''(a) misrepresenting pertinent facts and policy provisions relating to the coverage at issue, in violation of . . . § 38a-816 (6) (A); (b) failing to acknowledge and act with reasonable promptness upon the plaintiff's initiation of the claim, in violation of . . . § 38a-816 (6) (B); (c) refusing to pay the claim without conducting a reasonable investigation based upon all available information, in violation of . . . § 38a-816 (6) (D); (d) not attempting in good faith to effectuate a prompt, fair and equitable settlement of the claim, where liability is clear, in violation of . . . § 38a-816 (6) (F); and (e) failing to promptly provide a reasonable explanation of the basis in the [title] policy for denial of the claim, in violation of . . . § 38a-816 (6) (N).'' The plaintiff further alleges in count two that the defendant ''engaged in similar unfair and deceptive conduct on numerous other occasions,'' in violation of CUIPA, and that such conduct ''was committed and performed with such frequency as to indicate a general business practice of the defendant . . . .''

The matter was tried to the court, which rendered judgment in part[3] in favor of the defendant with respect to counts two, three and four of the third revised complaint. With respect to count two, the court concluded that the plaintiff had failed to demonstrate any unfair

claim settlement practices under CUIPA by the defendant. The plaintiff thereafter filed this appeal challenging the judgment only with respect to count two. Additional facts and procedural history will be set forth as necessary.

On appeal, the plaintiff argues that (1) the court applied an incorrect standard in its analysis of whether the defendant violated CUIPA by requiring the plaintiff to prove common-law bad faith by the defendant to establish a violation of CUIPA, (2) when the proper standard is applied, the record sufficiently demonstrates that the defendant violated the relevant provisions of CUIPA, and (3) the evidence submitted by the plaintiff establishes that the defendant's unfair practices were part of a general business practice, as required under § 38a-816 (6). Although the plaintiff has raised three claims on appeal, we address the third claim only, as its resolution is dispositive of this appeal.

Before addressing the merits of this claim, we set forth general principles governing CUIPA claims and our standard of review. "CUTPA is, on its face, a remedial statute that broadly prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . . To give effect to its provisions, [General Statutes §] 42-110g (a) of [CUTPA] establishes a private cause of action, available to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by [General Statutes §] 42-110b . . . . CUIPA, which specifically prohibits unfair business practices in the insurance industry and defines what constitutes such practices in that industry; see General Statutes § 38a-816; does not authorize a private right of action but, instead, empowers the [insurance] commissioner to enforce its provisions through administrative action. See General Statutes §§ 38a-817 and 38a-818. . . . [Our Supreme Court, however, has] determined that individuals may bring an action under CUTPA for violations of CUIPA. In order to sustain a CUIPA cause of action under CUTPA, a plaintiff must allege conduct that is proscribed by CUIPA." (Internal quotation marks omitted.) *Dorfman* v. *Smith*, 342 Conn. 582, 614, 271 A.3d 53 (2022). "[I]f a plaintiff brings a claim pursuant to CUIPA alleging an unfair insurance practice, and the plaintiff further claims that the CUIPA violation constituted a CUTPA violation, the failure of the CUIPA violation is fatal to the CUTPA claim." *State* v. *Acordia, Inc.*, 310 Conn. 1, 31, 73 A.3d 711 (2013); see also *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, 317 Conn. 602, 624, 119 A.3d 1139 (2015) ("a plaintiff cannot bring a CUTPA claim alleging an unfair insurance practice unless the practice violates CUIPA").

Section 38a-816 (6) of CUIPA prohibits unfair claim settlement practices, which are defined in relevant part

as "[c]ommitting or performing with such frequency as to indicate a general business practice any of the following: (A) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue; (B) failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies . . . (D) refusing to pay claims without conducting a reasonable investigation based upon all available information . . . (F) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; [and] . . . (N) failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement . . . ." The issue of whether the evidence presented demonstrates that the insurer engaged in unfair settlement practices with such frequency as to indicate a general business practice involves a question of law over which we exercise plenary review.[4] See generally *Lees* v. *Middlesex Ins. Co.*, 229 Conn. 842, 847, 643 A.2d 1282 (1994) (affirming trial court's determination on motion for summary judgment, as matter of law, that undisputed evidence did not demonstrate general business practice by defendant); see also *Volpe* v. *Paul Revere Life Ins. Co.*, Docket No. 3:98-CV-972 (CFD), 2001 WL 1011955, *2 (D. Conn. August 29, 2001) (evidence presented was insufficient as matter of law to demonstrate general business practice). We are also mindful that "[t]he scope of our appellate review depends [on] the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *State* v. *Acordia, Inc.*, supra, 310 Conn. 15–16.

I

In order for this court to reach the merits of whether the evidence establishes a general business practice by the defendant, we first must address two preliminary issues: (1) which provisions of CUIPA are at issue in this appeal, and (2) what evidence was appropriately before the court as to whether a general business practice has been established.

A

With respect to the first issue, we first note that count two of the third revised complaint alleges violations by the defendant of subdivisions (A), (B), (D), (F), and (N) of § 38a-816 (6). The court, after referencing those same allegations in its memorandum of decision,[5] stated: "It must be kept in mind that the issue in this

case is not [the defendant's] denial of [the plaintiff's] claim, which is frequently the issue in CUIPA cases. The facts indicate that [the defendant] essentially accepted [the plaintiff's] claim not long after receiving his demand letter. The only issue during the protracted negotiations between the parties in this matter was the value of [the plaintiff's] claim, not its legitimacy, and, as a result, the value of the claim is the only issue before the court. As a result, the court finds, based on the evidence presented at trial, that the only CUIPA violations *cited by the plaintiff* that could potentially apply in this case are the claim[s] that [the defendant] failed to acknowledge and act with reasonable promptness upon communications with respect to [the plaintiff's] claim [in violation of § 38a-816 (6) (B)], and that [the defendant] did not attempt in good faith to effectuate prompt, fair and equitable settlement of [the plaintiff's] claim [in violation of § 38a-816 (6) (F)]." (Emphasis added; footnote omitted.)

On appeal, the defendant argues that the plaintiff has not challenged the court's finding that only subdivisions (B) and (F) of § 38a-816 (6) potentially could apply to this case and that the finding is not clearly erroneous. Although the plaintiff has not specifically challenged the court's finding, such a challenge could be implied from the plaintiff's arguments on appeal that the evidence presented establishes violations of other provisions of CUIPA. Thus, we must examine the record to determine whether it supports the court's finding.

"If the factual basis of a trial court's decision is challenged, the clearly erroneous standard of review applies. . . . While conducting our review, we properly afford the court's findings a great deal of deference because it is in the unique [position] to view the evidence presented in a totality of circumstances . . . . A court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . The legal conclusions of the trial court will stand, however, only if they are legally and logically correct and are consistent with the facts of the case." (Citations omitted; internal quotation marks omitted.) *Li* v. *Yaggi*, 212 Conn. App. 722, 731,    A.3d    (2022).

At trial, the plaintiff submitted forty-three exhibits into evidence. A large portion of those exhibits consists of copies of email communications between the plaintiff or his attorney and representatives of the defendant, and their subjects cover many topics, including settlement offers, the date of loss, requests for updates regarding the status of the plaintiff's claim, issues regarding the septic system and appraisals that were performed, and estimates for work relating to the septic, driveway, and landscape. A number of witnesses also

testified at the trial, including the plaintiff; Cynthia Baines, a senior claims counsel for the defendant who explained the steps taken in handling the plaintiff's claim and testified regarding the communications in the exhibits; owners of various businesses relating to excavating, driveways, trees, and landscaping; the three appraisers; and Robert P. Pryor, a professional engineer and land surveyor.

On the basis of our careful review of that evidence and testimony, there was no evidence presented that could have supported a finding that the defendant violated subdivision (D) of § 38a-816 (6)—"refusing to pay claims without conducting a reasonable investigation based upon all available information"—or subdivision (N)—"failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement"—as the defendant neither refused to pay nor denied the claim. Indeed, the court specifically found that the primary issue in the case "was the value of [the plaintiff's] claim, not its legitimacy," that at no time did the defendant "indicate any unwillingness to pay the claim," and that the defendant never denied the claim and, in fact, "essentially accepted [the plaintiff's] claim not long after receiving his demand letter."

We similarly conclude that the evidence presented by the plaintiff could not have supported a finding that the defendant violated subdivision (A) of § 38a-816 (6)—"[m]isrepresenting pertinent facts or insurance policy provisions relating to coverages at issue . . . ." The evidence presented by the plaintiff, which shows that the parties disagreed about various matters such as the date of loss, the relocation of the septic system, and the value of the plaintiff's claim, simply does not demonstrate any misrepresentations by the defendant, nor did the court find any. In fact, the court specifically found, on the basis of the testimony of Baines, whom the court found to be credible, "that at no time during the claims settlement process did [the defendant's] personnel act in bad faith or come within close proximity of doing so." It is not for this court to second-guess the credibility determinations of the trial court. See *Bayview Loan Servicing, LLC* v. *Gallant*, 209 Conn. App. 185, 193, 268 A.3d 119 (2021).

Moreover, the evidence presented shows numerous communications between the plaintiff and representatives of the defendant concerning the status of the plaintiff's claim and why its resolution had been delayed for more than five years, which could support a finding of a violation of subdivisions (B) and (F) of § 38a-816 (6), both of which relate to delays in communications and settling the claim. We, therefore, conclude that the court's finding "that the only CUIPA violations *cited by the plaintiff*[6] that could potentially apply in this case"

are the claims relating to subdivisions (B) and (F) of § 38a-816 (6) is not clearly erroneous. (Footnote added.)

Furthermore, in light of the court's finding that the defendant did not act in bad faith at any time during the settlement process, which was based on the court's credibility assessment of the testimony of the defendant's claims counsel, Baines, there can be no violation of § 38a-816 (6) (F), which requires a showing that the defendant did not attempt "in good faith to effectuate prompt, fair and equitable settlements" of the plaintiff's claim. The intrinsic component of bad faith in subdivision (F) precludes its applicability given the court's finding of no bad faith, the substance of which the plaintiff has not challenged on appeal.[7]

Accordingly, we conclude that the only provision of CUIPA relevant to this appeal is § 38a-816 (6) (B).

B

The following additional facts are relevant to the second preliminary issue we must address, namely, what evidence was appropriately before the court as to whether a general business practice has been established.

As stated previously in this opinion, in count two of the third revised complaint the plaintiff alleges that the defendant "engaged in similar unfair and deceptive conduct on numerous other occasions," in violation of CUIPA, and that such conduct "was committed and performed with such frequency as to indicate a general business practice of the defendant . . . ." In support of that allegation, the third revised complaint references five complaints filed with the Insurance Department (department) involving the defendant and cites *Davis* v. *Fidelity National Ins. Co.*, 32 Pa. D. & C.5th 179 (2013) (*Davis I*), an adjudicated case from Pennsylvania involving the defendant.

During the trial, the plaintiff sought to admit into evidence exhibit 44, which consisted of the consumer complaints filed with the department alleging unfair insurance practices by the defendant that were referenced in count two. The court denied admission of exhibit 44 on the ground that it did not involve adjudicated matters.[8] Specifically, the court stated: "I have good news and bad news for you. If they are unadjudicated, I'm not letting them in. However, anything that's adjudicated, I . . . *could take* judicial notice of anything that's adjudicated. . . . You can give me a list of cases countrywide where [the defendant] has been . . . adjudicated having committed an unfair insurance practice. And *I could take judicial notice of it*." (Emphasis added.) The court thereafter admitted into evidence exhibits 41, 42, and 43, all of which concerned the *Davis I* case cited in count two.

On March 3, 2020, before trial resumed, the court heard arguments from the parties concerning a motion

to dismiss filed by the defendant, in which the defendant sought, inter alia, to dismiss count two on the ground that, as a matter of law, the plaintiff had failed to establish a general business practice by the defendant, as required by § 38a-816 (6). In his memorandum in opposition to the defendant's motion to dismiss, the plaintiff cited four instances in which the defendant allegedly engaged in bad faith settlement practices similar to its conduct in the present case (additional instances of insurance misconduct). Copies of those materials were attached as an exhibit to the plaintiff's memorandum.[9] At the hearing thereon on March 3, the defendant argued that the only evidence admitted in support of the plaintiff's claim of a general business practice by the defendant was the *Davis I* case, that the court declined to admit the other administrative matters handled by the department, and that any new allegations raised by the plaintiff should be excluded as a matter of law because the plaintiff already had rested his case without making a request for the court to take judicial notice of any matters, and the defendant would be prejudiced if the court considered any new evidence.

During argument, the parties addressed the additional instances of insurance misconduct cited by the plaintiff in his memorandum in opposition to the motion to dismiss, and the following colloquy transpired:

"[The Plaintiff's Counsel]: . . . And the court gave us clear instruction on Thursday, you said if we come back with more cases that demonstrate these—this repetitive conduct, the court will take judicial notice of those cases and they would come in. And that's what we did, Your Honor, over the weekend . . . [we] found all of these . . . cases, four or five more cases.

"So, we've . . . met [our] burden, it's . . . there. And I'm happy to give the court the citations to take judicial notice. . . .

"The Court: Haven't they been submitted as the exhibit?

"[The Plaintiff's Counsel]: Not yet, Your Honor, we were going to give you . . . our instruction was to give you citations and then the court would take . . . notice. . . .

"The Court: I think there's an exhibit with cases. I didn't . . . look at it, I just—

"[The Plaintiff's Counsel]: No, there's—Your Honor, there's one exhibit with . . . the case from Pennsylvania.

"The Court: Okay. . . . Let me—as a threshold, I agree with you, I think I opened the door and allowed you to do that. [The defendant's counsel] may not agree, but, I think I did. So . . . all right. Continue?

"[The Plaintiff's Counsel]: So, those are there, Your Honor. . . . [The defendant's counsel] . . . is free to

argue the relevance and the applicability of each one of those cases. However, they do exist and are there. . . .

"[The Defendant's Counsel]: If I may, Your Honor, prior to resting, I don't believe there was any request by the plaintiff to allow this court to consider post-resting evidence. . . .

"The Court: I—it's my distinct recollection that I invited him to do so . . . ."

The court held off ruling on the motion to dismiss at that time. Thereafter, it rendered judgment in favor of the defendant with respect to count two, which obviated the need for the court to reach the issue of whether the defendant's actions were part of a general business practice, as raised in the defendant's motion to dismiss.

On appeal, the plaintiff argues that "the record is clear that the trial court took judicial notice of the [additional instances of insurance misconduct]" referenced at the March 3, 2020 hearing and included in the exhibit to the plaintiff's memorandum in opposition to the defendant's motion to dismiss. The plaintiff further asserts that, even if this court finds that the trial court did not take judicial notice of the additional instances of insurance misconduct, "this court may judicially notice anything in the trial court's file, including exhibits to pleadings." The defendant counters that there is no evidence in the record demonstrating that the trial court was asked to take judicial notice of those additional instances of insurance misconduct, that it actually did so, or that it "provided the mandated notice to the parties and [an] opportunity to be heard." The defendant acknowledges the court's statements that it may have "invited" or "opened the door" to the additional evidence but argues that, "[i]n the discussion that followed, no request was made to submit these matters as exhibits, nor for the trial court to take judicial notice thereof. As such, these submissions are not evidence upon which the [plaintiff] can rely and should be afforded no consideration on whether a general business practice has been established."

We conclude that it is unclear from the record whether the court actually did take judicial notice of the additional instances of insurance misconduct. Although the court stated that it had "opened the door" to additional evidence, during that colloquy the plaintiff's counsel never made a request for the court to take judicial notice of the additional instances of insurance misconduct. The fact that the court previously had stated to the plaintiff's counsel that counsel could bring other adjudicated cases to the court's attention and that the court *could* take judicial notice of them, there is simply nothing in the record aside from the court's vague statements demonstrating that, once the additional instances of insurance misconduct were brought to the court's attention, it actually did take judicial

notice of them. Moreover, given that the court did not decide the issue of whether the evidence established a general business practice, it's memorandum of decision provides no guidance on this issue. Nevertheless, we need not decide whether the court took judicial notice of the additional instances of insurance misconduct because, even if we consider them together with the *Davis I* case,[10] for the reasons that follow we conclude, as a matter of law, that the plaintiff has failed to establish a general business practice by the defendant.

II

Having addressed those preliminary issues, we now turn to the issue of whether the evidence presented by the plaintiff establishes the existence of a general business practice by the defendant for purposes of § 38a-816 (6). We conclude that it does not.

We first note that, in their appellate briefs, the parties disagree as to whether the general business practice requirement is a condition precedent that must first be established or whether a plaintiff must first demonstrate a violation of one or more of the enumerated unfair settlement practices set forth in CUIPA. For example, the defendant argues that "the trial court [cannot] consider nor reach the issue of whether a CUIPA violation exists unless [the plaintiff] has proven that any alleged conduct of [the defendant] was committed with such frequency to constitute a 'general business practice.' " The plaintiff counters that the initial step a court must take concerning whether a defendant has violated CUIPA "is to first determine whether a . . . violation of CUIPA has been committed, not whether a general business practice has been established." We need not delve into that issue because a necessary element of a CUIPA claim is a finding of a general business practice, without which the CUIPA claim fails. Because § 38a-816 (6) requires the plaintiff to demonstrate that the defendant's alleged unfair claim settlement practices occurred with "such frequency as to indicate a general business practice," a determination by this court that the plaintiff has not met his statutory burden will be fatal to his CUIPA claim and dispositive of this appeal. Accordingly, for purposes of our analysis in this section, we assume that the plaintiff has demonstrated a violation of § 38a-816 (6) (B).

We next set forth general principles governing our resolution of this issue. "In requiring proof that the insurer has engaged in unfair claim settlement practices 'with such frequency as to indicate a general business practice,' the legislature has manifested a clear intent to exempt from coverage under CUIPA isolated instances of insurer misconduct." (Footnote omitted.) *Lees* v. *Middlesex Ins. Co.*, supra, 229 Conn. 849. Thus, our Supreme Court has concluded "that claims of unfair settlement practices under CUIPA require a showing of more than a single act of insurance misconduct."

*Mead* v. *Burns*, 199 Conn. 651, 659, 509 A.2d 11 (1986); see also *Dorfman* v. *Smith*, supra, 342 Conn. 615.

Because the term "general business practice" is not defined in § 38a-816 (6), in *Lees* our Supreme Court looked "to the common understanding of the words as expressed in a dictionary. . . . 'General' is defined as 'prevalent, usual [or] widespread'; Webster's Third New International Dictionary; and 'practice' means '[p]erformance or application habitually engaged in . . . [or] repeated or customary action.' Id." (Citation omitted.) *Lees* v. *Middlesex Ins. Co.*, supra, 229 Conn. 849 n.8. Thus, the court concluded that "the defendant's alleged improper conduct in the handling of a single insurance claim, without any evidence of misconduct by the defendant in the processing of any other claim, does not rise to the level of a 'general business practice' as required by § 38a-816 (6)." Id., 849.

"Where [a] [p]laintiff relies on other lawsuits in which those plaintiffs alleged similar conduct as [the] [p]laintiff alleges here, the [c]ourt may draw an inference that [the] [d]efendant engaged in that conduct with the frequency necessary for a 'business practice' under CUIPA." *Bilyard* v. *American Bankers Ins. Co. of Florida*, Docket No. 3:20CV1059 (JBA), 2021 WL 4291173, *3 (D. Conn. September 21, 2021). "To determine whether instances of insurance misconduct spanning different cases and different parties are sufficiently related to constitute a general business practice, courts . . . have considered the following factors: [T]he degree of similarity between the alleged unfair practices in other instances and the practice allegedly harming the plaintiff; the degree of similarity between the insurance policy held by the plaintiff and the policies held by other alleged victims of the defendant's practices; the degree of similarity between claims made under the plaintiff's policy and those made by other alleged victims under their respective policies; and the degree to which the defendant is related to other entities engaging in similar practices." (Internal quotation marks omitted.) *Preferred Display, Inc.* v. *Great American Ins. Co. of New York*, 288 F. Supp. 3d 515, 528–29 (D. Conn. 2018). Although those factors have been used by courts to determine "whether a plaintiff has made facially plausible factual allegations of a general business practice" to survive a motion to dismiss under the federal rules of procedure; *Phillips* v. *State Farm Fire & Casualty Co.*, Docket No. 3:19-CV-623 (AWT), 2020 WL 3105485, *5 (D. Conn. February 28, 2020); they are equally applicable to whether the evidence presented, as a matter of law, establishes a general business practice by the defendant. This is particularly true in a case such as the present one, in which the plaintiff relies exclusively on published judicial decisions as evidence of the general business practice. In such a circumstance, we are in as good a position as was the trial court to determine whether, in light of the various factors courts have

applied, the prior judicial determinations provide sufficient evidence of a general business practice.

Before we address the case cited in the third revised complaint as evidence of a general business practice of the defendant—*Davis* v. *Fidelity National Ins. Co.*, supra, 32 Pa. D. & C.5th 179—we first address the additional instances of insurance misconduct relied on by the plaintiff at the March 3, 2020 hearing to establish a general business practice by the defendant, which include *Davis* v. *Fidelity National Title Ins. Co.*, Docket No. 672 MDA 2014, 2015 WL 7356286 (Pa. Super. March 18, 2015) (*Davis II*); *Fidelity National Title Ins. Co.* v. *Matrix Financial Services Corp.*, 567 S.E.2d 96 (Ga. App. 2002) (*Matrix Financial*); Official Order, Tex. Commissioner of Ins. No. 2019-5951, In re Fidelity National Title Ins. Co. (May 3, 2019) (Texas order); and *Santa Fe Valley Partners* v. *Fidelity National Title Ins. Co.*, California Superior Court, Docket No. 638367 (August13, 1992) (*Santa Fe*). Although those additional instances of insurance misconduct all involve Fidelity National Title Insurance Company or its affiliates as a party and claims pursuant to title policies issued by Fidelity National Title Insurance Company, they have little, if any, evidentiary value with respect to the issue of a general business practice by the defendant in the present case, as the claims involved therein are not sufficiently similar to the one in the present case. See *Thomas* v. *Vigilant Ins. Co.*, Docket No. 3:21-CV-00211 (KAD), 2022 WL 844601, *8 (D. Conn. March 22, 2022) ("[p]rior instances of insurance misconduct offered to demonstrate a general business practice must be sufficiently similar to the allegations at issue to support such a conclusion" (internal quotation marks omitted)).

*Davis II* is an appeal to the Superior Court of Pennsylvania from the decision of the Court of Common Pleas in *Davis I*. *Davis II* involves a challenge to the determination by the Court of Common Pleas of lost profits and its award of punitive damages and addresses the issue of the delays by the insurer only with respect to the damages award. *Davis* v. *Fidelity National Ins. Co.*, supra, 2015 WL 7356286, *1, 4. It, thus, provides no support whatsoever for a finding of a general business practice of the defendant in relation to the facts of the present case.

Likewise, *Matrix Financial* provides little help with respect to this issue. That case involves an action brought against the insurer for breach of a title insurance contract and bad faith refusal to pay an insurance claim. See *Fidelity National Title Ins. Co.* v. *Matrix Financial Services Corp.*, supra, 567 S.E.2d 97. The Georgia Court of Appeals affirmed the summary judgment rendered against the insurer with respect to a claim that it had refused in bad faith to pay the title insurance claim in violation of a Georgia statute, which is not at issue in the present case. Id., 102. The issue

in *Matrix Financial*—a bad faith failure to pay an insurance claim—is inapposite to the issue in the present case of whether the defendant engaged in a general business practice of failing to acknowledge and respond to communications regarding an insurance claim with reasonable promptness. Furthermore, unlike in *Matrix Financial,* in the present case the court found that the defendant did not engage in bad faith, a finding not challenged by the plaintiff on appeal.

With respect to the Texas order, the insurer was found to have violated a number of provisions of the Texas Insurance Code in connection with a title policy it had issued, including failing to close the transaction, failing "to promptly investigate the validity of a title defect not excepted or excluded from the policy," and failing "to accept, deny, or conditionally accept a claim within [thirty] days or notify the insured of its inability to do so . . . ." Official Order, Tex. Commissioner of Ins. No. 2019-5951, supra, p. 4. Again, these findings bear little weight on whether the defendant in the present case, which from the outset accepted the claim, has engaged in a general business practice of delays in communicating regarding an insurance claim.

Finally, in *Santa Fe* the plaintiffs brought an action for breach of contract, breach of the implied covenant of good faith and fair dealing and negligent misrepresentation in connection with a title policy issued by the defendant insurer. *Santa Fe Valley Partners* v. *Fidelity National Title Ins. Co.*, California Superior Court, Docket No. 638367, Complaint (August 16, 1991). As part of their claim that the insurer had breached the implied covenant of good faith and fair dealing, the plaintiffs alleged that the insurer "fail[ed] to acknowledge and act reasonably and promptly upon communications with respect to [the] [p]laintiffs' claims," a claim similar to the one in the present case. Id., p. 11. The matter was tried to a jury, which returned a verdict in favor of the plaintiffs. *Santa Fe Valley Partners* v. *Fidelity National Title Ins. Co.*, supra, California Superior Court, Docket No. 638367. The verdict form reveals that the jury in *Santa Fe* found that the insurer acted unreasonably in handling the claim and that, with respect to the claim for breach of the implied covenant of good faith and fair dealing, it "acted with malice, fraud, or oppression . . . ." Id. Those findings fail to address the allegation relevant to the present case, namely, whether the insurer failed to acknowledge or act promptly with respect to communications regarding the claim filed by the plaintiffs. The materials submitted by the plaintiff in the present case include the allegations made against the insurer in *Santa Fe* and a jury verdict form; they do not show any substantive ruling on whether the insurer was found to have committed the particular alleged unfair settlement practice, especially when the count containing that claim included numerous other allegations of misconduct by the

insurer. Allegations alone are not sufficient to demonstrate a general business practice. See *Moura* v. *Harleysville Preferred Ins. Co.*, Docket No. 3:18-cv-422 (VAB), 2019 WL 5298242, *9 (D. Conn. October 18, 2019). Accordingly, we conclude that the additional instances of insurance misconduct relied on by the plaintiff do not demonstrate a general business practice of delays by the defendant similar to the defendant's conduct in the present case.

We now address the case cited in the third revised complaint on which the plaintiff also relies to establish a general business practice by the defendant—*Davis* v. *Fidelity National Ins. Co.*, supra, 32 Pa. D. & C.5th 179. In that case, the plaintiff insureds (Davis plaintiffs) brought an action against the defendant insurer for bad faith and breach of contract arising out of a title insurance policy issued by the insurer. Id., 181. The Court of Common Pleas of Pennsylvania concluded that "there were several known legal duties and fiduciary obligations recklessly disregarded by [the insurer], namely unreasonable delay in adjusting and resolving the claim [and] repeated violations of the Unfair Insurance Practices Act . . . ." Id., 189. Of significance, the court found that the insurer had violated 40 Pa. Stat. and Cons. Stat. § 1171.5 (a) (10) (ii) (West 2006) by "failing to acknowledge and act promptly upon written or oral communication with respect to claims arising under insurance policies"; id., 199; the language of which is nearly identical to that of § 38a-816 (6) (B). Although the court in *Davis I* found a similar unfair settlement practice as the one at issue in the present case, when the facts of *Davis I* are closely analyzed, the differences between *Davis I* and the present case become strikingly apparent.

In *Davis I*, the insurer did not deny coverage but, rather, took twenty months to complete its investigation and notify the Davis plaintiffs that the claim was covered under the policy, and subsequently delayed payment for three more years, extending an offer to settle only after the action against it was commenced. Id., 199–201. The court's conclusion that the insurer had violated 40 Pa. Stat. and Cons. Stat. § 1171.5 (a) (10) (ii) (West 2006) was premised on its finding that the insurer had "routinely ignored [the] [p]laintiffs, who initiated repeated communications . . . with [the] insurer over a period of years." Id., 200–201. In fact, the court referenced "a disturbing pattern of chronic delay" by the insurer. Id., 193. Moreover, in finding bad faith by the insurer, the court in *Davis I* found that the insurer acted with a reckless indifference to the rights of its insureds and in failing to resolve the claim during the five year period, which was evidenced by communications in which it recognized that it had no reasonable basis to continue to deny, by delay, the resolution of the claim and that it knowingly had threatened a meritless lawsuit as a way to delay resolution of the claim. Id., 194.

In contrast, in the present case, the court specifically found that the defendant's "actions in this case clearly [did] not represent shining examples of sterling claims management practices," and that "the issues that arose and the delay that resulted in this case were due, in no small part, to [the plaintiff's] unrealistic expectations colliding with [the defendant's] maddening corporate inefficiency." The court further explained: "[The defendant's] shortcomings in this regard include, but are not limited to, the fact that four different claims counsel handled [the plaintiff's] claim in this matter, which was pending for almost six years before he filed suit. There was probably nothing more emblematic of [the defendant's] failings in this regard than when a report produced on [the defendant's] behalf mistakenly attacked the credibility of its own appraiser rather [than] [the plaintiff's] appraiser."

Furthermore, in the present case, a great deal of the delay was attributable to the issue raised by the plaintiff concerning the septic system, which the court found not to be relevant to the diminution in value figure. Specifically, the court stated: "As relates to the issue of the septic system that occupied so much of the parties' time and energy, both during the prolonged negotiations that culminated in this lawsuit and at trial, the court is of the opinion that it has little to no relevance to the [diminution in] value of the property. As a result, in arriving at a [diminution in] value figure, the court declines to consider [the plaintiff's] claims that the disputed area is the location where a replacement system could be most economically located in the event the current system needs to be replaced. While [the plaintiff's] assertion may, in fact, be accurate, the court finds the issue of the potential location of a new septic system that may or may not be needed sometime in the future to be of tenuous relevance to the [diminution in] value of the property."

The delays in the present case, therefore, were caused by both the plaintiff and the defendant and resulted, in part, from corporate inefficiencies and mismanagement of the defendant, whereas in *Davis I*, the insurer repeatedly *ignored* the Davis plaintiffs and its delays were purposeful and resulted from a reckless indifference to their claim and a bad faith motive to delay paying in order "to find a cheaper way of escaping their liability to settle [the] claim . . . ." *Davis* v. *Fidelity National Ins. Co.*, supra, 32 Pa. D. & C.5th 195. The evidence in the present case does not support a finding that the defendant ignored communications from the plaintiff. In fact, the record shows numerous communications by agents of the defendant with the plaintiff, who, at times, took a great deal of time to respond. Baines testified to one such communication from Dorr to the plaintiff in February, 2015, in which she rejected a settlement offer of the plaintiff, tendered a new offer to settle

from the defendant of $29,000, and requested that the plaintiff respond within thirty days. The plaintiff, however, did not respond until eight months later in October, 2015. The degree of similarity of the facts supporting the finding of an unfair settlement practice in both cases is lacking. *Davis I*, thus, does not provide support in the present case to show a general business practice of the defendant, which, as the court found, had less than stellar management practices that resulted, at times, in delayed communications regarding the plaintiff's claim.

Moreover, even if we construe *Davis I* as providing some support for the plaintiff's claim that the defendant had a general business practice of delaying communications, we conclude that the plaintiff, nevertheless, has not met his burden of demonstrating such a general business practice by the defendant. The plaintiff relies heavily on the statement of our Supreme Court in *Mead* "that claims of unfair settlement practices under CUIPA require a showing of more than a single act of insurance misconduct." *Mead* v. *Burns*, supra, 199 Conn. 659. We do not construe that statement in *Mead* as standing for the proposition that a plaintiff will necessarily meet his or her statutory burden simply by including a citation to at least one other decision in which the insurer has been adjudicated to have committed a similar unfair insurance settlement practice. Rather, we construe *Mead* as clarifying the statutory requirement that the unfair claim settlement practice be performed or committed "with such frequency as to indicate a general business practice"; General Statutes § 38a-816 (6); that is to say, the words "with such frequency" indicate that more than a single act of misconduct is required, but that does not mean that a single additional act is sufficient.[11] Although no precise number of similar acts has been set by the appellate courts of this state and we decline to do so today,[12] we conclude that such a determination must be made on the basis of the facts of each case and an examination of the evidence presented. See *Belz* v. *Peerless Ins. Co.*, 46 F. Supp. 3d 157, 165–66 (D. Conn. 2014) ("It is clear that a plaintiff must show more than a single act of insurance misconduct . . . [or] isolated instances of unfair settlement practices in order to successfully claim that the defendant has a general business practice of unfairly resolving disputes. . . . However, what constitutes a general business practice and the frequency with which the plaintiff needs to prove that the defendant has unfairly resolved claims are far less clear." (Citations omitted; internal quotation marks omitted.)).

In the present case, the cases relied on by the plaintiff to show a general business practice are factually distinguishable and have questionable evidentiary value in light of their differences, and the plaintiff has failed to present any testimony or other documentary evidence relating to the alleged business practice of the defen-

dant. Also, the plaintiff is claiming a general business practice of delays by the defendant, when a fair portion of the delays in the present case were due, in part, to other causes, including the plaintiff's own delayed responses to communications and his insistence on receiving compensation for the potential relocation of a replacement septic system, an issue that prolonged the negotiations and that the court ultimately found to be of tenuous relevance to the diminution in value of the property. Under these circumstances, we cannot find that the plaintiff has met his statutory burden under § 38a-816 (6) of demonstrating a general business practice by the defendant as required under the statute. See *Gabriel* v. *Liberty Mutual Fire Ins. Co.*, Docket No. 3:14-cv-01435 (VAB), 2017 WL 6731713, *10 (D. Conn. December 29, 2017) (granting motion for summary judgment and concluding as matter of law that there was insufficient information in record to permit jury to conclude that defendant insurer violated CUTPA/CUIPA when plaintiffs offered evidence of lawsuits involving insurer but did not support CUTPA/CUIPA claim with other evidence such as "depositions with insurance company employees or other relevant individuals").

The plaintiff, having failed to establish a general business practice of the defendant, has failed to set forth a valid CUIPA claim, which is fatal to his CUTPA claim in count two. The court, therefore, properly rendered judgment in favor of the defendant with respect to the CUTPA claim in count two.[13]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Although § 38a-816 (6) was the subject of technical amendments in 2012; see Public Acts 2012, No. 12-145, § 37; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[2] The other counts allege claims for breach of contract (count one), breach of the implied covenant of good faith and fair dealing (count three), and unjust enrichment (count four).

[3] The court rendered judgment in favor of the plaintiff with respect to his claim of breach of contract in count one of the third revised complaint, awarding him damages in the amount of $92,000.

[4] In the present case, the trial court did not reach the issue of whether the evidence established a general business practice by the defendant, as the court resolved the action by concluding that the plaintiff had failed to demonstrate any unfair claims settlement practices by the defendant. We, nevertheless, reach the issue in light of our plenary review of this question of law. See part II of this opinion.

[5] Specifically, the court stated: "[The plaintiff] specifically claims that [the defendant] violated CUIPA in the following ways: (1) By misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue [§ 38a-816 (6) (A)]; (2) by failing to acknowledge and act with reasonable promptness upon communications with respect to his claim [§ 38a-816 (6) (B)]; (3) by refusing to pay his claim without conducting a reasonable investigation based upon all available information [§ 38a-816 (6) (D)]; (4) by not attempting in good faith to effectuate prompt, fair and equitable settlement of his claim [§ 38a-816 (6) (F)]; and (5) by failing to promptly provide a reasonable explanation of the basis in the policy for the denial of his claim [§ 38a-816 (6) (N)]."

[6] To the extent that the plaintiff references on appeal other provisions of CUIPA, namely, § 38a-816 (1) and (2), as well as § 38a-816 (6) (C), (G), and (M), we do not address them. First, those provisions were never cited in

the plaintiff's operative complaint. "It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of [his] complaint. . . . The purpose of the complaint is to limit the issues to be decided at the trial of a case and is calculated to prevent surprise. . . . A complaint should fairly put the defendant on notice of the claims against him. . . . In other words, [a] plaintiff may not allege one cause of action and recover upon another. . . . In addition, in the context of a postjudgment appeal, if a review of the record demonstrates that an unpleaded cause of action actually was litigated at trial without objection such that the opposing party cannot claim surprise or prejudice, the judgment will not be disturbed on the basis of a pleading irregularity. . . . In that circumstance, provided the plaintiff has produced sufficient evidence to prove the elements of his unpleaded claim, the defendant will be deemed to have waived any defects in notice. . . . Put another way, a court may not render a judgment for a plaintiff on a theory that is neither pleaded nor pursued by the plaintiff at trial." (Citations omitted; internal quotation marks omitted.) *Gleason* v. *Durden*, 211 Conn. App. 416, 430–31, 272 A.3d 1129, cert. denied, 343 Conn. 921, 275 A.3d 211 (2022).

Second, the trial court stated in its memorandum of decision that the matter was tried over the course of seven days. The appellate record does not contain transcripts for two of those days—February 27 and March 4, 2020. In our review of the transcripts provided, we have not found any reference to those additional provisions or to arguments or evidence relating to them. To the extent that arguments concerning those additional provisions may have been raised in the transcripts not provided to this court, the record is not adequate for this court to make such a determination. See *Ng* v. *Wal-Mart Stores, Inc.*, 122 Conn. App. 533, 537, 998 A.2d 1214 (2010) (it is appellant's burden to provide this court with adequate record on which to decide issues on appeal, which includes necessary transcripts); see also Practice Book § 61-10.

Moreover, although the plaintiff referenced those additional provisions in his posttrial brief, the court never mentioned them in its memorandum of decision, which expressly referenced the provisions of CUIPA "cited by the plaintiff . . . ." It logically follows from that statement that the court was referring to the provisions cited in the third revised complaint. The plaintiff did file a motion for articulation, which was denied, and the plaintiff filed a motion for review with this court, which granted the motion but denied the relief requested therein. Notably, though, the motion for articulation simply asked the court if it found violations of § 38a-816 (1) and (2), and § 38a-816 (6) (A), (B), (C), (D), (F), (G), (M), and (N); the plaintiff never asked the court to articulate what provisions the court specifically considered when it found that only subdivisions (B) and (F) of § 38a-816 (6) potentially could apply, even though the court's decision, in substance, referenced only the provisions of CUIPA cited in the complaint and not the additional ones raised in the plaintiff's posttrial brief.

[7] The plaintiff's primary claim on appeal is that the court employed an incorrect standard when it required a showing of bad faith to establish a violation of CUIPA. In making that claim, however, the plaintiff has not challenged the finding itself of no bad faith conduct by the defendant. That is further evidenced by the fact that the plaintiff has not challenged on appeal the judgment rendered in favor of the defendant on count three alleging a breach of the implied covenant of good faith and fair dealing, which necessarily requires a showing of bad faith. Significantly, the court stated in its decision that "[a] finding of bad faith on [the defendant's] part is an essential element of the plaintiff's claim that [the defendant] breached the covenant of good faith and fair dealing, and, as a result, the plaintiff could not recover under that claim . . . ." Thus, its finding of no bad faith on the defendant's part was necessary to its resolution of the plaintiff's claim of breach of the implied covenant of good faith and fair dealing in the third revised complaint, regardless of whether it should have applied to the CUIPA claims.

Moreover, although the plaintiff argues in his brief that the defendant did not attempt in good faith to effectuate prompt, fair and equitable settlement of his claim, his analysis fails to specifically challenge the court's finding of no bad faith by the defendant. Instead, the plaintiff merely gives a few examples of conduct he claims demonstrates that the defendant did not attempt in good faith to settle his claim. Because the plaintiff has failed to provide any analysis or citation to authority demonstrating why the court's finding of no bad faith was improper, the brief is inadequate for this court to review that finding. See *Rosier* v. *Rosier*, 103 Conn. App. 338, 340 n.2, 928

A.2d 1228 ("We are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Where the parties cite no law and provide no analysis of their claims, we do not review such claims." (Internal quotation marks omitted.)), cert. denied, 284 Conn. 932, 934 A.2d 247 (2007).

[8] The plaintiff has not challenged that ruling on appeal.

[9] Those additional instances of insurance misconduct include three case citations and an official order from the Texas Commissioner of Insurance: *Fidelity National Title Ins. Co.* v. *Matrix Financial Services Corp.*, 567 S.E.2d 96 (Ga. App. 2002); *Santa Fe Valley Partners* v. *Fidelity National Title Ins. Co.*, Docket No. 638367 (Cal. Super. August 13, 1992); *Davis* v. *Fidelity National Title Ins. Co.*, Docket No. 672 MDA 2014, 2015 WL 7356286 (Pa. Super. March 18, 2015); and Official Order, Tex. Commissioner of Ins. No. 2019-5951, In re Fidelity National Title Ins. Co., (May 3, 2019).

[10] At the March 3, 2020 hearing, the defendant's attorney did address each of the additional instances of insurance misconduct and argued why they were not applicable and failed to demonstrate a general business practice by the defendant.

[11] The Federal District Court for the District of Connecticut commented on a similar issue in *Hartford Roman Catholic Diocesan Corp.* v. *Interstate Fire & Casualty Co.*, Docket No. 3:12cv1641 (JBA), 2017 WL 3172536 (D. Conn. July 26, 2017), aff'd, 905 F.3d 84 (2d Cir. 2018), stating: "It is undisputed that violation of [§] 38a-816 (6) 'requires proof that the unfair settlement practices were "with such frequency as to indicate a general business practice."' *Lees* [v. *Middlesex Ins. Co.*, supra, 229 Conn. 847–48 (quoting *Mead* v. *Burns*, [supra, 199 Conn. 651]). Still, the [plaintiff, Hartford Roman Catholic Diocesan Corporation (Archdiocese)], relying on *Lees* and quoting *Quimby* v. *Kimberly Clark* [*Corp.*], 28 Conn. App. 660, 671–72 [613 A.2d 838] (1992), argues that 'more than a singular failure' involving only the policyholder-plaintiff suffices to establish a general business practice. . . . [The defendant, Interstate Fire & Casualty Company (Interstate)] counters that although 'many cases have held that more than one act of misconduct is necessary . . . the Archdiocese is twisting those holdings to mean that anything more than one instance is sufficient to prove a CUIPA violation.' . . . This [c]ourt agrees with [Interstate]. While both *Quimby* (reviewing [S]uperior [C]ourt's grant of defendant's motion to strike) and *Lees* (reviewing [S]uperior [C]ourt's grant of summary judgment) found that 'isolated' or 'singular' instances of insurer misconduct were not sufficient to satisfy the 'general business practice' requirement where the respective plaintiffs failed to either allege facts or present evidence of misconduct by the defendant in processing any other claims, both cases noted the necessity for a plaintiff to show the practice was engaged in with some 'frequency.' " (Citations omitted; emphasis omitted.) *Hartford Roman Catholic Diocesan Corp.* v. *Interstate Fire & Casualty Co.*, supra, *3.

[12] See *Hartford Roman Catholic Diocesan Corp.* v. *Interstate Fire & Casualty Co.*, 905 F.3d 84, 96 (2d Cir. 2018) ("While a single instance of misconduct is insufficient to demonstrate a 'general business' practice under CUIPA; see *Mead* v. *Burns*, [supra, 199 Conn. 659], no Connecticut appellate court has said how many acts of misconduct would suffice, nor is 'general business practice' defined in . . . § 38a-816 (6). Acknowledging this, the Connecticut Supreme Court in *Lees* [v. *Middlesex Ins. Co.*, supra, 229 Conn. 849], advised that a court 'may look to the common understanding of the words as expressed in a dictionary.' ").

[13] "We may affirm a judgment of the trial court albeit on different grounds." *Seminole Realty, LLC* v. *Sekretaev*, 192 Conn. App. 405, 416 n.16, 218 A.3d 198, cert. denied, 334 Conn. 905, 220 A.3d 35 (2019).